## CALUMET BROADCASTING CORPORATION v. FEDERAL COMMUNICATIONS COMMISSION.

### No. 9294.

United States Court of Appeals

District of Columbia.

Argued Jan. 6, 1947.

Decided March 10, 1947.

Mr. William A. Roberts, of Washington, D. C., with whom Messrs. Edgar Turlington and Thad H. Brown, Jr., both of Washington, D. C., were on the brief, for appellant.

Mr. Max Goldman, of Washington, D. C., Attorney, Federal Communications Commission, with whom Mr. Benedict P. Cottone, General Counsel, Federal Communications Commission, and Mr. Harry M. Plotkin, Assistant General Counsel, Federal Communications Commission, both of Washington, D. C., were on the brief, for appellee.

Before GRONER, Chief Justice, and WILBUR K. MILLER and PRETTYMAN, Associate Justices.

PRETTYMAN, Associate Justice.

The appellant Broadcasting Corporation applied to the appellee Commission for a permit to construct and operate a broadcast station. After hearing, the Commission denied the application, upon the ground that it could not with assurance entrust the applicant with the duties and obligations incumbent upon licensees, and it was, therefore, unable to find that a grant of the application would serve the public interest, convenience and necessity. [1] The bases for these final conclusions were findings to the effect that in the applications and financial statements filed with the Commission, and in testimony at the hearing, the applicant's officers and principal stockholders were reluctant, evasive and guilty of a lack of candor, and that they misrepresented and concealed facts.

The Supreme Court has held, in Federal Communications Commission v. WOKO, 1946, 329 U.S. 223, 67 S.Ct. 213, that the Commission is empowered to deny an application, as not in the public interest, convenience and necessity, because of deception practiced upon the Commission by stockholders or officers of the applicant. The Court there rejected the contention that the public interest, convenience and necessity is a composite of elements, sometimes conflicting, and that all elements must be evaluated to ascertain the net result. It held that Congress has confided to the Commission the problem whether the public interest would be served by renewal of a license where a high standard of public service had been established by a station but deception had been practiced by its officers. That decision governs that point in the case at bar.

Appellant urges, however, that the conclusions stated by the Commission are not supported by substantial evidence and are arbitrary and capricious. The point was vigorously and ably urged by counsel, both in the briefs and in oral argument, and so we have examined with care the entire record, as presented to us in the printed joint appendix.

The Commission says that the officers of the applicant were evasive and deceptive in respect to financial matters. The order which designated the application for hearing emphasized the desire of the Commission to obtain full information with reference to such matters, and thus the applicant was fully advised as to the Commission's concern in that respect. The statute refers to the character, financial ability, and ownership of applicants, and these references are to actualities; they, therefore, encompass not only formal corporate records but also underlying or coincident agreements and understandings. Such agreements and understandings are, therefore, pertinent to the application.

It is unnecessary that we recite the evidence at length. Several incidents are sufficient.

The application, a supplemental affidavit dated January 21, 1944, and testimony at the hearings are in conflict and confusion concerning 30 shares of stock, the certificate for which was issued to one Saliner. The application stated that Saliner had furnished cash for the stock and had acquired the cash from his business and investments, and indicated that he had voted the stock in person. The supplemental affidavit also stated that this stock was represented by cash. In hearings held after

---

[1] Act of June 19, 1934, 48 Stat. 1089, 47 U.S.C.A. § 319.

the original proceedings had been closed and then reopened, it developed that Saliner had never paid cash or property for the stock, did not hold it, and had never voted it; that he had agreed that if he became program director for the applicant, he would subscribe to 30 shares of stock, and that a certificate had been executed in his name and put in the files at the applicant's office. At one point, the vice president-treasurer of the applicant testified that it had received cash from its president for Saliner's stock, but her testimony conflicted with the description given by the president of the personal cash used by him in the organization. At another time, the vice president-treasurer said that when the fully-equipped station was exchanged for stock, the Saliner stock was paid for "under this arrangement". That statement was in conflict with the part of the supplemental affidavit which explained the exchange of stock for the station and the purchase of the Saliner stock.

Another incident concerned the source of the funds which the president of the corporation contributed to the purchase of the equipment later turned over to the corporation for stock. On direct examination at the hearing, he listed $16,500 as from "personal funds", $10,000 from the sale of real estate, $16,000 from the sale of stock, and several times said that he had borrowed $5,000. The statements as to personal funds and the sale of stock were in conflict with personal balance sheets which he had filed, and in later testimony he said that these items had come from assets of his family, mentioning his brothers. In respect to the $5,000, he later testified that this was a family liability and, still later, that it was a gift. He gave no further details.

Again, the application and the initial testimony at the hearings were specific to the effect that neither the applicant nor its president had any outstanding liabilities. It later developed that there was outstanding, more than two months prior to the hearing, a note of the applicant for $15,000, secured by a chattel mortgage on all its personal property. Likewise, there was a personal note of the president and vice president-treasurer for $10,000, secured by

a pledge of all their stock in the applicant and by the applicant's note and chattel mortgage. In justification it is said that this transaction was explained in full by the vice president-treasurer on her direct examination at the first hearing. But that testimony came after cross examination of the president and after counsel for the Commission had privately advised counsel for the applicant that he knew all the details of the transaction, none of which applicant's counsel knew.

The president of the corporation was asked at the hearing concerning a conference with a Mr. Thompson. It was alleged that the conference concerned a possible transfer of stock in the applicant. The president at first testified that a Mr. Gale was with him but that nobody else was there, and specifically said that a Mr. Bolger was not there. A little later he testified that he was not sure whether the one man who came into the room during the conference, but who did not take part in the conversation, was Gale or Bolger. Still later he said that he had a conference with Thompson in the company of Gale and Bolger, and that it was Bolger who had asked him to go to the conference and had accompanied him there.

The Supreme Court held in the WOKO case, supra, that whether evasion or deception is of material facts or of major importance to the ultimate decision of the Commission on an application, is beside the point. The Court there said: "The willingness to deceive a regulatory body may be disclosed by immaterial and useless deceptions as well as by material and persuasive ones. We do not think it is an answer to say that the deception was unnecessary and served no purpose." 67 S.Ct. 215.

█ We think that the conduct of the officers of the applicant in the case at bar clearly disclosed their willingness to deceive the Commission. Moreover, the concealment, or failure to disclose, was of material facts. The possibility of some understanding or collateral agreement as to the real ownership of the applicant was indicated by each of the incidents to which we have referred. The simple facts as to each were well within the knowledge of

the witnesses and were susceptible of simple and unequivocal statement. They were within the proper scope of and pertinent to the inquiry by the Commission. We cannot say that the conclusion of the Commission, based upon the facts which we have briefly outlined, was arbitrary, capricious, or without substantial foundation.

■ Appellant also complains that the proceedings before the Commission did not satisfy the requirements of due process because of the harassing tactics of counsel for the Commission. Being jealous of the treatment of people who must appear as litigants or witnesses before any tribunal, whether judicial or administrative, over which we have the duty of review, we have carefully observed the course of counsel as we examined the record. We do not find that he transgressed the bounds of propriety or fairness. Upon several occasions, when the witness seemed confused, he suggested a recess or a reference to records, for the purpose of avoiding mistakes. His cross examination was, it is true, long and persistent, but it seems to us that it was neither longer nor more persistent that the unsatisfactory and, as we have indicated, evasive answers of the witnesses required if counsel were to endeavor to get the precise and accurate information he was legitimately seeking. As we read the record, the confusion arose from the answers of the witnesses and not from attempts of counsel to misstate or mislead in his questions.

■ Appellant urges that the admission of certain phonographic records in evidence invalidated the proceedings. These records were identified as being mechanical recordings of the conversation at the Thompson conference, above discussed. It was further shown that the recording was done at the request of Mr. Thompson but without the knowledge of the other participants. Amazing though this revelation may be, it could not prevent the use of the recordings if and when they later came into the possession of Government authorities. No participation of those authorities in the making of the recordings was shown. A full foundation for their use to impeach the testimony of the president of the applicant was laid. We do not find their admission erroneous.

Affirmed.