STATE, RESPONDENT, v. PORTER, APPELLANT.

No. 9059.

Submitted October 22, 1951. Decided March 12, 1952.

242 Pac. (2d) 984.

Mr. Ralph J. Anderson, Mr. Albert C. Angstman, Helena, for appellant.

Mr. Arnold H. Olsen, Atty. Gen., Mrs. Vera Jean Heckathorn, Asst. Atty. Gen., Mr. William H. Coldiron, Asst. Atty. Gen., Mr. Michael G. Chilton, County Atty., Helena, for respondent.

Mr. Anderson and Mr. Coldiron argued orally.

MR. JUSTICE METCALF:

The information charges that between July 25, 1949, and October 28, 1949, the defendant corruptly and unlawfully attempted to influence Matthew Vook, a grand juror, in respect to his decision, judgment or report in certain matters concerning the defendant then pending before, and being investigated by the grand jury, "by means of oral communications not in the regular course of proceedings of said Grand Jury, by means of threats, intimidation, persuasion and entreaty and by means of promises to pay to said Matthew Vook, as such juror, lawful money of the United States." The defendant was convicted and from the judgment of conviction brings this appeal.

Other questions concerning the same grand jury have been before this court in State ex rel. Adami v. Lewis and Clark County, 124 Mont. 282, 220 Pac. (2d) 1052; State ex rel. Porter v. District Court, 124 Mont. 249, 220 Pac. (2d) 1035; and State ex rel. Porter v. First Judicial District, 123 Mont. 447, 215 Pac. (2d) 279. In the latter two cases the defendant at bar was the relator.

On May 19, 1950, six days prior to his trial, the defendant challenged the entire trial jury panel under the provisions of Chapter 71, Title 94, R. C. M. 1947. The basis for the challenge was that the court had excused and dismissed so many of the trial jurors that the panel consisted of but 23 jurors and that after those jurors who were subject to challenge for cause were excused there would not be a sufficient number of regularly impaneled jurors to try the case and therefore the court would draw additional trial jurors from jury box No. 3 to the detriment of defendant.

At the hearing on the challenge counsel for the defendant, Stanley M. Doyle, testified that on March 29, 1950, a panel of 70 jurors was called for the term. By May 24, 1950, 47 jurors had been excused so that on that date but 23 jurors remained to try the case. (On the day of trial this number had been reduced to 21.) Of the remaining jurors, five were subject to challenge for cause. The witness gave the names of these jurors and re-

cited the facts upon which such a challenge would be based and they appear to be sufficient to sustain such a challenge under R. C. M. 1947, secs. 94-7119, 94-7120.

Under the provisions of R. C. M. 1947, sec. 94-7115, the defendant was allowed six peremptory challenges and by section 94-7116 the state a like number. Therefore if the remaining jurors were all satisfactory for cause to the state and defendant, and the defendant exercised his six peremptory challenges the panel would be insufficient even though the state did not take a single peremptory challenge.

In State v. Hay, 120 Mont. 573, 194 Pac. (2d) 232, 235, this court reaffirmed the principle laid down by the Montana territorial supreme court that a "defendant has a right to an impartial jury" selected from the proper place and drawn and summoned according to law. Dupont v. McAdow, 6 Mont. 226, 229, 9 Pac. 925, 926. Repeatedly this court has required the trial court to substantially comply with the statutes in procuring a jury. Any material deviation or departure is a denial of fundamental constitutional rights. State v. Groom, 49 Mont. 354, 359, 141 Pac. 858; State v. Tighe, 27 Mont. 327, 71 Pac. 3.

"The right to a trial by jury is an undisputed right, and in order that this right may be preserved to parties interested, it is a self-evident proposition that the law of their procurement must be observed. This form of trial is by the county, and those serving must be selected from the duly qualified citizens of the county." Kennon v. Gilmer, 4 Mont. 433, 455, 2 Pac. 21, 24.

In order to carry out the constitutional guarantee that the accused in a criminal prosecution shall have a right to "a speedy public trial by an impartial jury of the county" (Const. of Montana, Art. III, sec. 16), the legislature has provided that the names of all eligible jurors of the county be placed in jury box No. 1. R. C. M. 1947, sec. 93-1404. It is from the names in this jury box that the trial jury is drawn and summoned. R. C. M. 1947, sec. 93-1502.

The statute also provides that the clerk of court must keep

a box known as jury box No. 3 in which duplicate ballots containing the names of all persons qualified as trial jurors who reside in the city or town where the trial term is held. R. C. M. 1947, sec. 93-1506.

The trial court may in its discretion direct the clerk to draw additional jurors from jury box No. 3 when a sufficient number of trial jurors to form a jury do not attend or cannot be obtained without great delay or expense. R. C. M. 1947, sec. 93-1510.

The trial judge is allowed considerable discretion within the statute. But jurors may only be drawn from jury box No. 3 in case the emergency set out in the statute occurs, i. e., insufficient trial jurors and great delay or expense in procuring additional jurors in the ordinary manner, "the evident intent and purpose of the Legislature being to guaranty to every person a trial by a jury called by lot from the whole body of qualified jurors in the county." State v. Landry, 29 Mont. 218, 224, 74 Pac. 418, 420. Thus after part of the trial jury is impaneled it would cause undue delay to require the sheriff to find and serve jurors in the outlying reaches of the county and cause extraordinary expense in that the members of the jury would be idle while the additional jurors were being obtained. But section 93-1510 does not authorize the court to resort to jury box No. 3 merely because serving prospective jurors residing at a distance from the county seat or paying mileage fees to such jurors will incur additional expense.

As was pointed out in Lee v. Hayden, 63 Mont. 589, 595, 208 Pac. 596, 597, the court's discretion is a reasonable one and must be exercised in a reasonable manner to carry out the purpose and intent of the Constitution and the statutes, "which it is assumed will not be abused, as, for example, by drawing in the first instance a very small and insufficient panel from box No. 1, and then under the emergency which the court itself has created, drawing the major portion of the panel from box No. 3."

In the instant case the panel was not ample for all ordinary purposes; its inadequacy was called to the attention of

the court six days before the case was to be tried. There is nothing in the record to show any sudden emergency justifying denial of defendant's motion to obtain additional jurors from jury box No. 1. This defendant was of the belief that a ''Main Street'' jury would be antagonistic to him and he made a timely request to have the venire augmented by additional jurors drawn from the entire county. This was his right under the Constitution and under the statutes. Kennon v. Gilmer, 4 Mont. 433, 2 Pac. 21. Failure to provide an adequate panel was an abuse of discretion and amounted to the systematic and calculated exclusion of persons residing throughout the county at large other than those living in the city of Helena. This practice was condemned in State v. Hay, 120 Mont. 573, 194 Pac. (2d) 232, and cases therein cited. The difference between the instant case and State v. Hay is that in the latter case the challenge was interposed on the day set for trial and securing jurors from jury Box No. 1 would cause undue expense and delay within the meaning of the statute and therefore the challenge came too late. State v. Pippi, 59 Mont. 116, 195 Pac. 556. Here the challenge to the panel was interposed in time to have secured additional jurors in the statutory manner.

This court in State ex rel. Adami v. Lewis and Clark County, 124 Mont. 282, 220 Pac. (2d) 1052, determined that the term of the grand jury of which Matthew Vook, the prosecuting witness, was a member, expired by operation of law on September 11, 1949.

The statutory definition of *embracery* is corruptly attempting ██ to influence a grand juror so that the offense may be committed even though the offender fail to accomplish his object. R. C. M. 1947, sec. 94-806. But even an attempt must be directed at an object upon which it is possible to commit the crime. 1 Burdick, Law of Crime, secs. 143, 144; 14 Am. Jur., Criminal Law, sec. 70, p. 818.

After September 11, 1949, Matthew Vook was no longer a ██ grand juror; he had been discharged by operation of law. Therefore, even though the defendant thought he was influenc-

ing a grand juror in actuality he was not and the crime of embracery could not be committed. State v. Taylor, 345 Mo. 325, 133 S. W. (2d) 336.

All evidence of acts committed after September 11, 1949, should have been excluded and the time during which the defendant allegedly attempted to influence grand juror Vook limited to the period when Vook was a duly and regularly impaneled grand juror.

A motion for a new trial was made upon the ground that the verdict was contrary to the evidence. This motion was overruled. Specification of error No. 2 assigns error for overruling such motion and specification No. 3 recites that "the verdict is contrary to the evidence and the law." These specifications were not urged in the appellant's brief.

A good part of the evidence introduced related to conversations between the defendant and grand juror Vook after the discharge of the grand jury. Since it is impossible to determine the effect of this evidence on the minds of the jurors this alone would justify reversal. But disregarding such inadmissible evidence, there are acts that took place before the discharge of the grand jury which would sustain a conviction, so that we cannot say as a matter of law that the cause should be dismissed. Vook testified that the defendant came to see him on July 25, 1949, and they talked for half to three-quarters of an hour. At this time Porter declared to Vook that he was the victim of a frameup. Two or three days later Porter asked Vook to try to keep Porter's name out of the paper. The second conversation was longer; according to Vook it "wasn't much over an hour." Porter told Vook, "If you will help me, I'll help you." There followed some conversation about the losses in wages that Vook was suffering as a result of his serving on the grand jury. Vook testified that it was in connection with this part of the conversation that Porter had said he would help Vook out. Then Vook said, "* * * I thought it was nothing but a joke from the start." Later on during Vook's cross-examination the following testimony was elicited:

"Q. Mr. Porter never offered you any money, did he? A. Not money, but he told me that one time he would help me to make up my losses if I lost money on this.

"Q. And didn't you testify yesterday that you thought that was a joke? A. I thought it was at first but after I thought it over I thought probably it wasn't."

The defendant's own testimony on direct examination contains significant admissions.

"Q. Now, Mr. Porter, directing your attention to a statement made by the forgotten man in this case, Matthew Vook. Mr. Vook testified that he had told you that his service on the grand jury was costing money, costing him money. Is that right? A. That is correct.

"Q. What was the conversation that resulted from that statement by Mr. Vook, when he made it to you, if you can remember, as near as you can remember, where you were and exactly what was said and the manner and fashion in which it was said. A. Well, he told me, as close as I can remember—now, I don't want to be—

"Q. Your best recollection. A. He told me, when I met Mr. Vook, I think I asked him when this jury, grand jury, was going to end, I think I've asked everybody that, and he told me that he wished it would end. He said: 'It is costing me money and has cost me enough to serve on this grand jury.' He said: 'I'm losing $6.00 a day,' or something like that, 'for not being able to work at the smelter.' I sympathized with him on that point and of course, I don't ever remember of saying that I would make up the difference in salary although I was awful desperate at the time but I'm sure I never offered him any money or anything like that; I am positive of that. I think Mr. Vook testified to that."

There were other conversations between Vook and defendant that may or may not be pertinent as the record does not indicate when they took place. During the course of the trial evidence of conversations between the defendant and other members of the grand jury was admitted. These conversations were

introduced for the purpose of showing the intention of the defendant. The defendant didn't deny most of the acts upon which the state relied; Indeed he voluntarily admitted most of them. But defendant did insist that he never corruptly intended to influence Matthew Vook or any other members of the grand jury.

The defense proffered correct instructions informing the jury as to the purpose of such evidence, but these instructions were refused. Instead the court gave an instruction which was misleading. It may be that on a new trial this issue may not arise for many of the acts took place after September 11, 1949, but if conversations with other grand jurors occurring before September 11, 1949, are admitted in evidence, the jury's consideration of them must be limited as suggested by instruction offered by defendant.

In its proof that the defendant had talked to other members of the grand jury the foreman, James W. Salsbury, was permitted to testify to conversations he had had with the defendant. Mr. Salsbury testified on direct examination as a witness for the prosecution that he listened to a tape recording made by the defendant of a conversation between special prosecutor Small and Small's secretary. The court refused to let the defense cross-examine Salsbury as to the content of this recording and refused to let the defendant testify as to its contents or allow the recording to be played to the jury.

The defendant sought to introduce three other recordings for impeachment purposes. One was a recording of a conversation between the defendant and deputy sheriff Higgins, which the defendant wished to use to impeach testimony given by Higgins on direct examination. Higgins testified to a conversation with Porter at Porter's garage. The defendant wanted to introduce the recording to show that Higgins had made contradictory statements different from those sworn to on the stand.

Higgins on direct examination testified that he never told Porter that one, Tom Alley, was at a meeting in the Helena

valley at which the foreman of the grand jury, the special prosecutor and Higgins were present. Higgins then testified that Porter offered him $1,000 to say that Alley was present at that meeting. It was to refute this and to prove that the witness Higgins had said that Alley was present and that no bribe was offered that the defendant sought to introduce the recording of the conversation.

The second recording was of a telephone conversation between the defendant and grand juror Harold H. McClellan. This conversation took place on May 25, 1950, a few days before the trial. In order to lay a foundation for impeachment on cross-examination McClellan was asked if in his telephone conversation he did not tell Porter that he had not been offered a bribe. McClellan denied that he had made that statement. The defendant then sought to have the witness identify his voice on the recording and subsequently the defendant made an offer of proof that the recording of the telephone conversation would reveal that McClellan had stated that Porter "had not tendered anything of value, money, or anything else to the said McClellan and repeatedly during a twelve minute conversation reaffirmed and restated that he, the said McClellan, had not been influenced, coerced, threatened or bribed in any manner or fashion by the defendant Roger Porter herein."

The third recording was of a conversation between the special prosecutor and the foreman of the grand jury and the defendant sought to introduce contradictory statements.

The most common form of impeachment is to discredit a witness by proof of other inconsistent or contradictory statements. Such contradictory statements bear directly on the credibility of the witness.

The defendant's offer of proof recited that the recordings of telephone conversations were obtained without violation of Montana statutes and the other recordings were the original unaltered recordings and were a complete record of the conversations.

The objections to their admissibility were not based upon

any exception to the admissibility of recordings as such. Both parties concede that mechanical reproductions of sound are competent evidence providing that an adequate foundation is laid to insure their accuracy and reliability. See Annotation in 168 A. L. R. 927.

The state's objections were that these recordings were incompetent, irrelevant and immaterial; that they related to collateral matters; that they were hearsay and not the best evidence; and that they violated "the right of privacy guaranteed by the Constitution, federal and state; and that the recordings of telephone conversations are in violation of the federal communications act pertinent to the federal statute."

The three recordings sought to be introduced for impeachment purposes were not subject to the hearsay rule. They were offered to show that inconsistent and contradictory statements relative to the same matter testified to on direct examination had been made by the witnesses. The credibility of the witnesses was challenged. The question was not whether the statements were true or not. There was no attempt to prove the facts in the statements but the fact that the staements were made. If the witness did make contradictory statements the party challenging the credibility of such witness should be allowed to prove the fact that such contradictory statements were made. The best evidence is a properly authenticated voice recording of the witness making the contradictory statements. The jury who heard the witness testify that he did not make such a statement hears in the witness's own voice with inflections and overtones that can't be reproduced in any other manner. Counsel for defendant makes an analogy of a writing that contains a contradictory statement. Such a writing can be introduced even though the person who read it or observed it being written is present in court to testify. The three recordings should have been admitted for impeachment purposes. Calumet Broadcasting Corp. v. Federal Communications Comm., 82 U. S. App. D. C. 59, 160 F. (2d) 285, 288. Nor does the record indicate that there was a violation of any state

or federal statutes in making the recording of the telephone conversation. The offer of proof states that the recording was made in compliance with the rules of the Montana public service commission.

Similarly the recording which the defendant played to the foreman of the grand jury allegedly to improperly influence him should have been admitted. If it was relevant for the foreman to testify that the defendant attempted to improperly and corruptly influence his vote as a grand juror by playing the recording, it was proper for the jury to hear the recording that allegedly had such an effect. Otherwise the jury was permitted to conjecture as to the content of the recording and to imagine that it contained material greatly at variance with what the playing of the recording would actually have disclosed.

Throughout the case the defendant insisted that he was the victim of a conspiracy on the part of the special prosecutor, some of the grand jury, and Tom Alley. The defendant contended that Tom Alley was using the grand jury's investigation to gain control of the operation of slot machines in and around Helena. The defendant stated that his only purpose was to get the members of the grand jury to consent to his appearance before them to tell his side of the story. That contention may have been a red herring that was totally unworthy of belief, or it may have impressed the jury with its truth. Here where the defendant's motive and intent was the primary issue in dispute it was certainly appropriate to let the defendant prove his theory as best he could, especially when the whole field had been opened by the prosecution. It was error not to permit the defendant to play the recording that would have given him a chance to develop his defense. Whether such a defense was worthy of belief or not was a matter for the jury to decide.

The defendant sought to introduce in evidence the complaint filed by Porter in an action in which he sued the members of the grand jury and others for $150,000. This was the complaint

involved in State ex rel. Porter v. First Judicial District, 123 Mont. 447, 215 Pac. (2d) 279, which was deemed contemptuous and which this court declared to be scandalous and defamatory. The members of the grand jury admitted that they were prejudiced by the filing of that action and angered by the allegations in the complaint. The only purpose that the introduction of the complaint could have served would have been to show the bias and prejudice of the grand jurors who were witnesses against the accused. When they admitted that the filing of the suit and the charges made therein had angered them there was no reason to admit the complaint. State v. Jackson, 9 Mont. 508, 24 Pac. 213.

The defense requested an instruction as to the effect of accomplice testimony. There was evidence in the record from which the jury might have concluded that deputy sheriff Higgins was an accomplice of the defendant. That being the situation the court should have informed the jury that if they believed Higgins to have been an accomplice of the defendant, they were instructed to weigh his evidence as provided by R. C. M. 1947, sec. 93-2001-1, subd. 4, and that such evidence must be corroborated as required by R. C. M. 1947, sec. 94-7220.

The defendant was charged in the information with a violation of R. C. M. 1947, sec. 94-804, which provides in part that a person who corruptly attempts to influence a grand juror, ''By means of any communication, oral or written, had with him except in the regular course of proceedings,'' is punishable by fine or imprisonment. The defendant complains that the court failed to define what was a communication not ''in the regular course of proceedings.'' No instruction defining this term was offered by the defendant and he cannot raise this question for the first time on appeal. State v. Powell, 54 Mont. 217, 169 Pac. 46; State v. Francis, 58 Mont. 659, 194 Pac. 304; State v. McCarthy, 36 Mont. 226, 92 Pac. 521. Furthermore there is no evidence in the record which would lead the jury to believe that the defendant's communication was with Vook in the regular course of proceedings. The state's evi-

dence was that the defendant had conversed with Vook privately at the latter's home and this could not be construed to be in the regular course of proceedings.

The judgment is reversed and the cause remanded with directions to grant the defendant a new trial.

MR. CHIEF JUSTICE ADAIR and ASSOCIATE JUSTICES BOTTOMLY and ANGSTMAN, concur.

MR. JUSTICE FREEBOURN concurring in the reversal of the judgment but dissenting from that part of the opinion which remanded the case for a new trial:

I believe that the information should be dismissed because there was an utter failure to prove the material allegations of the information by competent and satisfactory evidence.

Defendant was charged with attempting to influence Matthew S. Vook, a grand juror, in respect to his decision in matters pending before the grand jury "by means of threats, intimidation, persuasion, and entreaty, and by means of promises to pay to said Matthew S. Vook, as such juror, lawful money of the United States."

Vook testified, on cross-examination:

"Q. Mr. Vook, did Roger Porter offer you or tender you at any time during the entire grand jury one dime of United States money? A. No, he didn't offer me no money.

"Q. Did he threaten you or intimidate you in any way? A. He didn't threaten me.

"Q. Did he send you any letter or communications that threatened or intimidated you in any way? A. No, sir."

On direct examination Vook testified:

"A. Well, I'm not certain really what was said on either night. * * * I think it was the third or fourth—the third time, or something like that; when he asked me to help try to keep his name out of the paper. * * * Well, he did tell me he would like to have his name kept out of the paper because it would hurt his family, would hurt his father, too. * * *

"Q. Will you state whether or not he asked you to help him keep his name out of the paper? A. Well, what he told me, he said: 'If you will help me, I'll help you.' * * *

"A. Well, he asked me to help him out.

"Q. In what way? A. Well, he asked me to keep his name out of the paper, it would hurt his kid, kill his dad, and a few other things like that. * * *

"Q. Will you state whether or not he said anything about your being on the jury costing you any money? A. Well, I couldn't really say that was him said that or myself. That it would cost me money.

"Q. Will you state whether or not he said anything about maybe being able to help make up any loss? A. I believe he said he would help me out, Yes.

"Q. Was that in connection with his statement if you would help him, he would help you? A. I believe it was. I thought it was nothing but a joke from the start."