thorize her trustee, with the approval of the court after full hearing, to do that which a competent owner similarly situated may, should, and usually does do; that is, plan and prepare for the day when the vast estate shall pass to other hands?

The records of this and other courts are replete with cases setting up trusts and making contributions to foundations, educational institutions, churches, and other charities. The trustee seeks to follow these sound business practices, but the Court says this is taking private property. To my single-track mind the only thing taken is the right of the trustee, acting for his beneficiary, to do with this vast estate what the General Assembly of North Carolina authorized him to do. The relatives in this public spirited family who are *sui juris* appear to have joined in the trustee's requests. The authority to follow the plan has been authorized by 170 of the people's representatives in session on Halifax Street. It is now set aside by a majority of the seven on Morgan.

This decision will haunt us. I vote to affirm.

PARKER and SHARP, JJ., join in dissenting opinion.

STATE v. GENE KNIGHT AND JOE WATKINS.

(Filed 17 January 1964.)

**1. Indictment and Warrant § 8—**

An indictment may jointly charge two defendants with non-burglarious breaking and entry, with larceny, and with receiving, since the offenses may be committed by more than one person at the same time.

**2. Same—**

An indictment may join a count of non-burglarious breaking and entry with a count of larceny and a count of receiving.

**3. Burglary and Unlawful Breakings § 2.1—**

An indictment charging the non-burglarious breaking and entry of a certain store, shop, warehouse, dwelling, house and building occupied by a named person is not subject to quashal for failure to inform defendants of the type of structure they are charged with breaking into, defendant's remedy being by motion for a bill of particulars if they desire more specific information to formulate their defense. G.S. 15-143.

**4. Criminal Law § 34—**

Testimony that some four months prior to the larceny of the safe as charged in the bill of indictment, one of defendants stated that drawings of the working parts of a safe shown to him by the witness belonged to

defendant, that he had memorized them and that if he ever robbed another safe it would be a big one, *held* competent against such defendant in connection with the other evidence adduced by the State tending to show that such defendant's *animus* continued to and through the date of the offense charged and naturally included the commission of such offense.

**5. Criminal Law § 90—**

Upon a joint indictment of two defendants, evidence tending to incriminate one of the defendants is properly admitted when its admission is restricted by the court exclusively to such defendant alone.

**6. Burglary and Unlawful Breakings § 1—**

There is a sufficient breaking where a person enters a building with a felonious intent by unlocking a door with a key.

**7. Larceny § 6—**

Upon the prosecution of two defendants jointly for larceny, evidence tending to show that each defendant possessed a quantity of the stolen money shortly after the commission of the theft is competent respectively against each.

**8. Burglary and Unlawful Breakings § 4; Larceny § 7— Evidence of defendants' guilt of unlawful entry and larceny held for jury.**

Evidence tending to show that a car borrowed by defendants in another municipality was seen several days before the commission of the crime in front of the house that was robbed, that two men, one identified as one defendant and the other who appeared to be about the same size and age as the other defendant, were seen a few hours before the offense was committed in front of the house, that the house was unlawfully entered and a quantity of money was taken from a safe kept therein, and that a day or two after the offense each defendant had in his possession large amounts of money, which money was identified by its musty smell as money taken from the safe in question, *is held* sufficient to be submitted to the jury as to each defendant on charges of both non-burglarious breaking and entry and larceny.

**9. Criminal Law §§ 67½, 83, 97—**

During the examination of the prosecuting witness defendants have the right to have the witness identify a television recording for the purpose of establishing their right to later introduce the recording in evidence, if they should so elect, but defendants are not entitled to introduce the television recording in its entirety on cross-examination while the State is putting on its evidence, and when defendants are allowed to put the entire recording in evidence without objection, the defendants are putting on evidence so as to entitle the State to the opening and closing arguments to the jury.

**10. Jury § 4—**

In a prosecution of two defendants jointly for offenses less than capital, the State is entitled to challenge peremptorily four jurors for each defendant. G.S. 15-164.

BOBBITT, J., dissenting in part.

APPEAL by defendants from Shaw, J., 10 June 1963 Regular Criminal Session of ROCKINGHAM.

Criminal prosecution on a three-count indictment charging the defendants with (1) non-burglariously breaking and entry, (2) larceny of a metal safe, of $75,000 in U. S. currency, and of stock and securities of the value of $100,000, and (3) receiving.

Before defendants pleaded, the prosecuting officer for the State announced in open court that he was putting the defendants on trial on the first two counts in the indictment and not on the third count charging receiving. Each defendant pleaded not guilty. The jury returned a verdict that each defendant was guilty as charged in the first two counts in the indictment.

From a judgment that Gene Knight be imprisoned for a term of ten years on his conviction on the first count in the indictment and for a term of five years on his conviction on the second count in the indictment, the sentence on the second count to begin at the expiration of the sentence on the first count, and from a similar judgment against Joe Watkins, each defendant appeals.

*Attorney General T. W. Bruton and Deputy Attorney General Harry W. McGalliard for the State.*

*Robert S. Cahoon and J. Owen Lindley for defendant appellants.*

PARKER, J.    Defendants assign as error the denial of their motion to quash the indictment, made in apt time before pleading to the indictment. They contend the indictment should be quashed for the following reasons: One, it is improper to charge them jointly in one indictment; two, the three counts of a non-burglariously breaking and entry, of larceny and of receiving are conflicting and broadside and improperly joined; and three, that the first count charges them with a non-burglariously breaking and entry into "a certain storehouse, shop, warehouse, dwelling house and building occupied by one Dr. C. W. McAnally," etc., which does not give them any specific information as to the type of structure they are charged with breaking into. This assignment of error is without merit.

"When an offense is one which may be committed by more than one person at the same time, the several persons engaged in its commission may be jointly charged." 42 C.J.S., Indictments and Informations, sec. 159, a, p. 1106.

In S. v. Mincher, 178 N.C. 698, 100 S.E. 339, the Court said: "It has been the uniform practice in this State to join a count for larceny with one for receiving in one indictment, and this has been repeatedly

approved." It is also proper to join a count for a non-burglariously breaking and entry with one for larceny at the same time and with one for receiving at the same time in one indictment in order to meet the evidence which may possibly be adduced at the trial, and this has been the uniform practice in this State. The three counts in the indictment correctly charge in the usual form all the essential elements of the three offenses charged.

The first count charging a non-burglariously breaking and entry charges the breaking and entry into certain buildings specified in G.S. 14-54, which creates the offense. The first count in the indictment charges all the essential ingredients of the offense created by G.S. 14-54, and is good. Where an indictment correctly charges all the essential elements of the offense, but is not as definite as the defendant may desire for his better defense, his remedy is by a motion for a bill of particulars, G.S. 15-143, and not by a motion to quash. *S. v. Everhardt*, 203 N.C. 610, 166 S.E. 738. When a bill of particulars is furnished, it limits the evidence to the transactions or items therein stated. *S. v. Williams*, 211 N.C. 569, 190 S.E. 898.

The next question for decision is whether the State's evidence survives each defendant's motion for judgment of nonsuit, and suffices to carry the case to the jury against both defendants or any one of them on the first two counts in the indictment or either of them.

The State's evidence, considered in the light most favorable to it, presents these facts:

Dr. C. W. McAnally, a practicing dentist for 40 years, lives in his own home in the town of Madison. About 25 or 30 years before 17 January 1963, he bought a metal safe, which he has had in his house since then. On 17 January 1963 this safe was located in a closet adjoining his bedroom, and he had in it bonds, stocks, insurance papers and $75,000 in U. S. money, all his property. This money consisted of hundred dollar bills, fifty dollar bills, twenty dollar bills, and a lesser number of five dollar bills. Some of that money was Series 1937; a large part of it was Series 1950. From time to time he went through his securities and money in the safe. He got some stock out the morning of 17 January 1963. This money, by reason of being kept for years in his safe, had a moldy, stinky odor.

He is a widower and lives alone. On 17 January 1963 his maid was off. On that day he went home for lunch about 11:40 a.m. He kept the key to his front door in a little wicker basket on the right-hand side when one enters the front door. He ate lunch in his kitchen. He then went into his bedroom and sat down in a chair. His house is surrounded by a fence. Between his fence and the street there is a tree. Looking

through his window in his bedroom, he saw standing on the sidewalk behind this tree a man he had never seen before. He watched him about thirty minutes. During this time this man moved once or twice to a little fill adjoining the sidewalk and was watching his house. About 12:55 p.m. he came out of his front door, locked it, put his key in the wicker basket, and started to his office. As he came out of his house, this man, whom he identified at the trial as defendant Gene Knight, looked at him, and he looked at this man. Then Gene Knight walked across the street to another man standing on Tuttle's Chevrolet lot, whom he had seen from the window of his bedroom standing there fifteen or twenty minutes. This man standing on the Chevrolet lot appeared about the same size and age as the defendant Joe Watkins.

He returned home about 5:00 p.m. His front door and the back door were unlocked. The wicker basket and the front door key were lying in the hallway. He went to the closet adjoining his bedroom, and his safe and all its contents were gone.

On 10 or 12 January 1963 John J. McCaskill, who lives in Greensboro, North Carolina, loaned his automobile, a 1956 two-door, two-tone Mercury sedan, to defendants. Between 9 and 10 p.m. on 18 January 1963 Joe Watkins, his first wife Ruby Dunn and her sister Bobbie Dunn, and a man whose name is not stated in the evidence, went to Salisbury, North Carolina, in Watkins' automobile. There Bobbie Dunn got in a 1956 Mercury sedan, drove it back to Greensboro, and parked it where Watkins showed her to park it, which was in front of where John J. McCaskill lives. The next morning McCaskill found his automobile parked in front of his home. It then had a dent in it from the left front door to the back panel. Later Watkins told him he had had an accident with the automobile and gave him three hundred dollars in twenty dollar bills saying that ought to take care of the damage. He spent two hundred dollars of this money and turned one hundred dollars of it over to the State Bureau of Investigation. The State introduced this hundred dollars in evidence. Dr. McAnally examined and smelled the five twenty dollar bills and testified he could identify it.

A few days before 17 January 1963 two men in Madison saw around 10 or 11 a.m. a two-tone automobile with a mashed-in side around the left front door parked in the street near Dr. McAnally's home. Two or three men were in it.

On the afternoon of 14 January 1963 the defendants and another man brought, or had pulled, a 1956 two-tone Mercury automobile into an automobile repair shop in the town of Randleman. They stayed there about an hour while James Brown, the foreman, fixed the starter.

Between 5 and 6 p.m. on 18 January 1963 Joe Watkins went to the home of his sister Mrs. Martha Baynes in Greensboro. He gave his sister $320 in money and told her to send money orders with it. He also left a suitcase with her. When Watkins left, his sister opened the suitcase and found in it a pillowcase looped at the top full of money. She immediately shut the suitcase and called her husband and her father. They called police officers in Greensboro and turned over to them the suitcase and its contents. In the pillowcase was $15,570 in paper money; it was straight or folded, had a musty smell and stunk, and a lot of it was Series 1928-1934. The odor from the paper money was so bad Mrs. Baynes sprayed her bedroom with an air-room deodorizer. This $15,570 was introduced in evidence by the State. Dr. McAnally examined it in detail, smelled it, and testified that this money, by reason of its odor, was his and was in his safe on 17 January 1963.

One Mary Ann Daye had her automobile financed by the Scottish Bank in Salisbury, North Carolina. On 18 January 1963 she and Joe Watkins came in the bank together, and she paid off the loan in money and assigned the title to Joe Thomas Watkins. Joe Watkins signed the certificate of title as purchaser in the bank. A certified copy of the certificate of title from the Department of Motor Vehicles was introduced in evidence. G.S. 20-42. This shows the bank released its lien on 18 January 1963, though the record on page 76 shows the loan was paid off 18 January 1962, which it seems manifest is a typographical error.

About 5:15 a.m. on 19 January 1963 two members of the military police stationed at Fort Bragg stopped an automobile on Highway 87, because it was "weaving" in the road and ran through a red traffic light. The driver, Joe Watkins, was drunk. In the automobile with him was his former wife Ruby Dunn. They carried him to the Military Police Station. Watkins had on his person $1,198, of which $1,180 was in twenty dollar bills. These bills were straight and had a musty smell, and were mildewed. Watkins had a hearing before C. W. Jackson, U. S. Commissioner, who put him under a bond of $300 to appear in U. S. District Court. Watkins gave the commissioner as bail fifteen twenty dollar bills. The commissioner testified, "there was a distinct odor of mustiness, an unpleasant odor to the money." The commissioner later turned over this $300 in money to an officer of the State Bureau of Investigation. This money was introduced in evidence by the State. Dr. McAnally examined it, smelled it, and testified that this money, by reason of its odor, was in his safe on 17 January 1963.

On the afternoon of 18 January 1963 Joe Watkins went to the home of his first wife Ruby Dunn and left with her a shoe box, supposedly

containing clothes for dry cleaning. Later a police officer of Greensboro came to her home, and she turned this box over to him. He opened the shoe box, and it contained $335 in money, most of it in twenty dollar bills. The State introduced this money in evidence. Dr. McAnally examined it, smelled it, and testified that it was in his safe on 17 January 1963.

On the afternoon of 18 January 1963 Gene Knight bought a second-hand Chevrolet automobile from I. M. Leonard, a second-hand car dealer in Lexington, North Carolina. He paid Leonard $2,100 in twenty dollar bills for this automobile. He had this money in a white envelope in an inside pocket. The next morning Leonard deposited this money, and an additional $105 in money and a $425 check, in a local bank, where it was received by Mrs. Jaunita Craver, a teller in the bank. Mrs. Craver testified, "I noticed about the money when I took in the deposit, it had a foul odor. It was kind of a pack-away smell, musty." About a week later Mrs. Craver turned over $920 of this foul-smell-ing money to Paul Case, chief of police of Madison. The State offered this $920 in evidence. Dr. McAnally examined this money, smelled it, and testified it was in his safe on 17 January 1963.

Paul Case and William H. Jackson, a captain of the Greensboro police department, on 21 January 1963 brought Gene Knight from Charlotte to Greensboro, and he was later carried to the Rockingham County jail. On the way from Charlotte to Greensboro they passed a road sign bearing the name Madison, and Gene Knight said, "There's one damn sign that I wish I had never seen." On one occasion Knight asked Paul Case, "Where did you run across my name in Madison?" and further said: "He could name three SOB's and one of them would be it. * * * if you make a good score, they get jealous. * * * he had not been in Madison since 1952."

John Vanderford, a special agent with the State Bureau of Investigation, testified he talked with Gene Knight on 15 September 1962 in Lincoln County. Defendants objected to anything that was said or done on this occasion. The State announced it was offering it only against Gene Knight. The court overruled Knight's objection and instructed the jury that the evidence was competent against Knight, admitted it against Gene Knight alone and not against Joe Watkins, and the jury should so consider it. Vanderford testified in substance that he had with him some eight drawings of the working parts of safes, and that he showed them to Knight. That Knight told him these drawings "be-longed to him, and that he knew I was going to keep them, but that he had memorized them and it didn't make any difference * * * that if he ever robbed another safe, it would be just one big one." Over de-

fendant's objection the court permitted the State to introduce these drawings in evidence. In overruling the objection, the court instructed the jury that these exhibits were admitted in evidence against Knight and not against Watkins, and the jury should so consider them. To all these rulings defendants objected, excepted, and assign them as error.

The closest case in point that we have found is *Commonwealth v. Corkery,* 175 Mass. 460, 56 N.E. 711. Corkery was indicted for the larceny of numerous milk cans from various owners. From a judgment of conviction he appealed. He took an exception to the admission in evidence of a conversation of his in February 1899, with a fellow servant, one Conlon, to the effect that if Conlon was short of cans, he could go out and steal them, and that, if Conlon did not do it, there were others that could do it. In overruling the exception, the Court said:

> "The cans in question were shown to belong to the alleged owners, and were found in the defendant's custody, under suspicious circumstances, not necessary to be detailed. The defendant testified that they were put where they were found about the 1st of May. Evidence of his animus in February, in connection with other circumstances of suspicion, was not too remote. Remoteness depends a good deal on the nature of the case. If the remark was found to have been made seriously, it showed that, less than three months before the cans were traced to his possession, the defendant contemplated with complacency the crime with which he was charged. It could not be presumed by the judge that he had experienced a change of heart in the meantime."

In *S. v. Ham,* 224 N.C. 128, 29 S.E. 2d 449, on a trial upon an indictment for robbery from the person of a woman, evidence that one of defendants was heard in effect to say some time before the alleged robbery was committed, in a conversation relative to other robberies in the community, that he knew an old woman who kept money under her dress, was held competent. The Court said:

> "This evidence was competent as tending to show that the defendant Ham knew the prosecutrix had money and kept it under her dress, of which money she was subsequently robbed. This was a circumstance, which standing alone may not have had any potency, but when considered in connection with all the other circumstances appearing in the evidence may not have been entirely feckless. In criminal cases every circumstance calculated to throw any light upon the supposed crime is permissible."

The statement of Knight to the effect that the eight drawings of the working parts of safes shown him by John Vanderford were his, that

he had memorized them, and that if he ever robbed another safe it would be just one big one, made a little over four months, according to the State's evidence, before Dr. McAnally's safe was stolen, and the evidence that some of the money therein was traced to Knight's possession, show that Knight "contemplated with complacency the crime with which he is charged" here. The evidence of Knight's *animus* on 15 September 1962, in connection with the other evidence adduced by the State against him, tends to show that such *animus* continued to and through 17 January 1963, and naturally included the commission of the offenses charged in the first and second counts in the indictment. This evidence was competent against Knight. It was not admitted against Watkins. Defendants' assignment of error to the admission of this evidence is overruled.

In respect to the money which the State's evidence tends to show belonged to Dr. McAnally and was in Watkins' possession a day or two after 17 January 1963, the court carefully instructed the jury that this evidence was admitted against Watkins alone and not against Knight, and the jury should so consider it. In respect to the State's evidence tending to show Knight purchased a second-hand automobile from I. M. Leonard on 18 January 1963, his payment of $2,100 for it in twenty dollar bills which had a foul odor, and the identification of $920 of this money as being in his safe on 17 January 1963 by Dr. McAnally, the court carefully instructed the jury that this evidence was admitted against Knight alone and not against Watkins, and the jury should so consider it.

Dr. McAnally's testimony is to the effect that about 12:55 p.m. he came out of his front door, locked it, put his key in the wicker basket, and went to his office. When he returned home about 5 p.m., his front door and back door were unlocked, and the wicker basket and the front door key were lying in the hallway. This evidence permits a reasonable inference that an entry was made into Dr. McAnally's house by unlocking the front door with his key, which was in the wicker basket. There is a sufficient breaking where a person enters a building with a felonious intent by unlocking a door with a key. *Creel v. State,* 23 Ala. App. 241, 124 So. 507, reh. den. 25 June 1929, cert. den. 220 Ala. 220, 124 So. 510; *S. v. Wurtz,* Mo., 11 S.W. 2d 1029; *Hawkins v. Com.,* 284 Ky. 33, 143 S.W. 2d 853; *Rippey v. State,* 86 Tex. Crim. 539, 219 S.W. 463; *McGilveray v. State,* 111 Tex. Crim. 256, 12 S.W. 2d 585; 12 C.J.S., Burglary, sec. 3, p. 670. See *S. v. Best,* 232 N.C. 575, 61 S.E. 2d 612.

The State's evidence, considered in the light most favorable to it, tends to show that defendant Knight and a man who appeared about

the same size and age as defendant Watkins were in front of Dr. Mc-Anally's home on 17 January 1963 for fifteen or twenty minutes or more, and that a short time thereafter—some one or two or three hours—Dr. McAnally's house was entered by unlocking the front door with a key and his safe and its contents stolen. A day or two later each defendant had in his possession large amounts of money, which the State's evidence tends to show belonged to Dr. McAnally and were in his safe when it was stolen on 17 January 1963. The Court said in *S. v. Best, supra*: "Then, too, the defendant's possession of the fruits of the crime recently after its commission justified the inference of guilt on his trial for larceny." The State's evidence, considered in the light most favorable to it, further tends to show that on 10 or 12 January 1963 John J. McCaskill loaned his automobile, a 1956 two-door, two-tone Mercury sedan, to defendants; that a few days before 17 January 1963 two men in Madison around 10 or 11 a.m. saw a two-tone automobile with a mashed-in side around the left front door parked in the street near Dr. McAnally's house and that two or three men were in it; that during the night of 18 January 1963 Bobbie Dunn, acting under the direction of the defendant Watkins, parked McCaskill's automobile in front of where he lives; that the next morning McCaskill found his automobile parked in front of his house, and it had a dent in it from the left front door to the back panel. Later Watkins told him he had an accident with the automobile and gave him $300 in twenty dollar bills to pay for the damage. McCaskill spent $200 of this money and turned $100 of it over to the State Bureau of Investigation. The State introduced this $100 in evidence, and Dr. McAnally examined it, smelled it, and testified he could identify it. There is ample evidence adduced by the State to carry the case to the jury against both defendants on the first two counts in the indictment, and the court properly overruled their separate motions for judgment of nonsuit.

On cross-examination of Dr. McAnally by defendants' counsel, he testified in effect: A lot of the money he had in his safe, when it was stolen, was Series 1950 money. He made a statement in his office about his money in his safe, when it was stolen, and it was recorded by the television people. It went on television, and he saw it. He thinks he would recognize himself in that picture on television. He never made the statement that nothing had been put in his safe in the last 25 years. The record shows defendants' counsel asked this question: "Would you come and set that up, please, sir? I want to see if you recognize your statement." Apparently defendants' counsel asked some-one to set up a television screen and show or play the recording to see if Dr. McAnally would identify the statement recorded as his own. The

State objected to the showing of the recording, unless defendants wanted to put it on as their evidence. Defendants' counsel said in effect he just wanted Dr. McAnally to say as to whether that is his voice and his statement; he wanted to put the statement in on cross-examination, and cross-examine him about it. The court ruled that when defendants put this statement in evidence, they were putting on evidence. Defendants excepted and assign this as error.

When the State closed its case, defendants called Dr. McAnally, as the record states, "for further cross-examination." The Court stated that it holds defendants are now putting on their own evidence. Defendants excepted and assign this as error. Dr. McAnally took the witness stand, the television recording was shown in its entirety without any objection on the part of the State, and he observed it. This is the television recording:

"Q (By the interviewer) Dr. McAnally, when did the burglary occur?

"A We think it occurred between 2:30 and 3:30.

"Q What day?

"A Thursday.

"Q And how did you discover it?

"A When I went home from the office approximately 4:55, my door was generally locked. The key was not where I generally kept it. I turned the knob, the door was unlocked and the key and the container was laying in the hallway in front of the door. I immediately walked back to my back door and it was unlocked. My back gate was wide open and naturally I supposed something should have or could have happened to this safe and I walked in to see and it was gone.

"Q How much money was stolen?

"A Approximately $75,000.00.

"Q Were there any other securities or bonds?

"A $25,000 or $35,000 in Government bonds.

"Q Have you made an accurate estimate of how much was in the safe since your robbery?

"A No, I have not.

"Q Has it always been your custom to keep large amounts of cash on hand?

"A This amount of money and these bonds have been in that location for 25 or 35 years. There has not been anything new plac-

ed in that safe in that length of time. The money that I have made in the past 25 or 30 years has been placed in banks, Building & Loan, or some type of investment.

"Q Will you keep this large amount of money in the future in your safe?

"A I will not keep $1500.00 in my safe from now on. I won't have a safe.

"Q In other words, you have learned your lesson?

"A Yes, sir, the hard way."

When the showing of the television recording ended, Dr. McAnally said: "That was me. That's my statement. To this extent. I did not place any money in there. My wife placed money in there the past ten or fifteen years." The record shows further cross-examination of Dr. McAnally by defendants' counsel.

When Dr. McAnally left the witness stand, the court ruled that defendants by introducing in evidence the television recording had put on evidence, and the State was entitled to open and conclude the arguments to the jury. To this ruling, defendants excepted and assign this as error.

In 1963 Cumulative Supplement to 20 Am. Jur., sec. 258, pp. 45-6, it is said: "Sounds are most commonly recorded on discs, wire, tape, or sound motion-picture film, and reproduced by various devices such as the phonograph, dictaphone, or sound projector. Usually the recording is effected by an electrical or electro-magnetic process. * * * Sound recordings which are shown to be accurate are admissible for purposes of impeachment, to present statements by witnesses or parties contradicting their trial testimony * * *." See Annotations 58 A.L.R. 2d 1024, Admissibility of sound recordings in evidence, particularly sec. 15, and 168 A.L.R. 927; and also *S. v. Walker*, 251 N.C. 465, 112 S.E. 2d 61, use of a tape recorder. See also 20 Am. Jur., Evidence, sec. 738, in respect to the admissibility of motion pictures as evidence.

In *State v. Porter*, 125 Mont. 503, 242 P. 2d 984, which was a prosecution for embracery, a failure to permit the defendant to introduce three recordings to impeach the credibility of certain prosecuting witnesses by showing that they had made prior contradictory statements different from those sworn to on their direct examination was held error.

In *Com. v. Clark*, 123 Pa. Super. 277, at p. 285, 187 A. 237, at p. 240, the Court said:

"* * * The phonograph, the dictaphone, the talking motion picture machine, and similar recording devices, with reproducing ap-

paratus, are now in such common use that the verity of their recording and reproducing sounds, including those made by the human voice in conversation, is well established; and as advances in such matters of scientific research and discovery are made and generally adopted, the courts will be permitted to make use of them by way of presenting evidentiary facts to the jury."

This was quoted with approval in *Com. v. Hart*, 403 Pa. 652, 170 A. 2d 850.

Defendants were within their rights in asking Dr. McAnally on cross-examination if he had not made a certain statement to the effect that nothing had been put in his safe in the last 25 years, which statement was inconsistent with, or contradictory to, his testimony in the trial that a lot of that money that he claimed was in the safe was Series 1950 money. *S. v. DeGraffenreid*, 223 N.C. 461, 27 S.E. 2d 130; 98 C.J.S., Witnesses, sec. 596. When Dr. McAnally denied making such a statement in respect to the subject matter about which he was being examined, the defendants had a right to introduce in evidence a television statement made by him inconsistent with, or contradictory to, his testimony in the trial in order to impeach him, provided a proper foundation was laid for the admission of such television recording by proof of its accuracy and of its being made by Dr. McAnally. *S. v. Patterson*, 24 N.C. 346; *S. v. Wellmon*, 222 N.C. 215, 22 S.E. 2d 437; *Smith v. Telegraph Co.*, 168 N.C. 515, 84 S.E. 796; 98 C.J.S., Witnesses, sec. 573, sec. 598 *et seq.*

The record plainly shows that the court did not limit defendants' cross-examination of Dr. McAnally, while he was a State's witness and before the State closed its case, in respect to prior inconsistent or contradictory statements made by him. It further shows that defendants' counsel desired to have the entire television recording shown or put in evidence, while he was cross-examining Dr. McAnally as a State's witness and before the State rested its case to see if Dr. McAnally recognized his statement. Defendants had a right to have Dr. McAnally identify the television recording as correct and made by himself in order that they could introduce it in evidence when their turn came to introduce evidence, if they so desired, but they had no right to introduce the television recording in its entirety on cross-examination while the State was putting on evidence. However, the ruling of the court that defendants could not show or play the television recording to Dr. McAnally on cross-examination, before the State rested its case, to see if he recognized his statement was not prejudicial to defendants, because they put or played the entire television recording in evidence be-

fore the jury without any objection by the State, and had the full bene-
fit of it, and Dr. McAnally testified after seeing it, "That was me.
That's my statement." The court was correct in its ruling that when
defendants put this television recording in evidence, they were putting
on evidence, and consequently the State was entitled to the opening
and closing arguments to the jury. As to opening and closing argu-
ments in a criminal case, see *S. v. Smith*, 237 N.C. 1, 23, 74 S.E. 2d 291,
306. Defendants' assignments of error 4 and 7 are based on exceptions
relating to the television recording as set forth above, and to the
court's ruling as to argument of counsel set forth above, and are over-
ruled.

Defendants assign as error the court's permitting the State to chal-
lenge peremptorily a fifth juror. This assignment of error is overruled.
G.S. 15-164 provides that in all criminal cases other than capital "a
challenge of four jurors shall be allowed in behalf of the State for
each defendant." *S. v. Levy*, 187 N.C. 581, 584, 122 S.E. 386, 388,
which speaks of C.S. 4634, which is identical with G.S. 15-164, with
the sole exception that more peremptory challenges are allowed by
G.S. 15-164.

An examination of defendants' other assignments of error brought
forward and discussed in their brief shows no prejudicial error sufficient
to warrant a new trial.

All defendants' assignments of error are overruled. In the trial be-
low we find

No error.

BOBBITT, J., dissenting in part as to defendant Knight: In my
opinion, the admission over Knight's objection of (1) Mr. Vanderford's
testimony as to what Knight said to him on September 15, 1962, and
(2) of the drawings referred to in this testimony, was prejudicial error
for which Knight is entitled to a new trial. This evidence tended to
show that Knight, prior to September 15, 1962, had studied the work-
ing parts of safes and had "robbed" one or more safes and was the
kind of person you would *suspect* whenever there was a "robbery" of
a safe.

The applicable rule is stated as follows: "Evidence of other offenses
is inadmissible if its only relevancy is to show the character of the
accused or his disposition to commit an offense of the nature of the
one charged; but if it tends to prove any other relevant fact it will not
be excluded merely because it also shows him to have been guilty of an
independent crime." Stansbury, North Carolina Evidence, Second Edi-
tion, § 91. In my opinion, the general rule controls here and the evi-

dence should have been excluded. Here there is no question as to the *animus* of the person(s) who broke and entered Dr. McAnally's home and carried away his safe and its contents.