No. 97-702

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 45

298 Mont. 358

2 P. 3d 204

STATE OF MONTANA,

Plaintiff and Respondent,

v.

CLIFFORD THOMAS LaMERE,

Defendant and Appellant.

APPEAL FROM: District Court of the Eighth Judicial District,

In and for the County of Cascade,

The Honorable Kenneth R. Neill, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Scott A. Albers (argued), Attorney at Law, Great Falls, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; Patricia J. Jordan (argued),

Assistant Attorney General; Helena, Montana

Brant S. Light, Cascade County Attorney, Great Falls, Montana

Argued: May 4, 1999

Submitted: June 29, 1999

Decided: February 15, 2000

Filed:

_____

Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 At approximately 1:00 p.m. on February 21, 1997, in an alley in Great Falls, Clifford Thomas LaMere (LaMere), an indigent three-fourths Chippewa Cree Indian, stabbed and killed Steven Brownlee, a white male. The State of Montana (the State) charged LaMere with deliberate homicide. In response, LaMere argued that he had killed the victim in self-defense. On August 15, 1997, LaMere filed a pre-trial Motion to Strike the Jury. LaMere's motion was subsequently denied by the Eighth Judicial District Court, Cascade County. On August 22, 1997, the jury found LaMere guilty of mitigated deliberate homicide.

¶2 LaMere appeals from the District Court's denial of his motion to strike the jury panel. We reverse and remand for a new trial.

¶3 The sole issue on appeal is whether the District Court erred in concluding that LaMere failed to show that the telephone-dependent summoning procedure utilized in Cascade County prejudiced his substantial rights to a jury drawn and summoned according to law.

## *FACTUAL AND PROCEDURAL HISTORY*

¶4 In a pre-trial conference held on August 7, 1997, the District Court directed that the jury for LaMere's trial be "pulled" by the following day, and that 100 jurors be summoned to appear in court. However, the jury clerk of court never received a written order from the District Court as to the number of jurors to draw for LaMere's trial. Thus, the clerk utilized

computerized random selection to draw 200 names from the list of eligible jurors in Cascade County. Of those possible jurors, 101 were summoned to court by telephone for LaMere's trial. LaMere objected to the sole use of the telephone by the clerk of court to summon prospective jurors and requested a hearing on the matter. A hearing was set for August 18, 1997, the day before trial.

¶5 On August 15, 1997, LaMere filed a motion to strike the jury panel and a supporting brief. In this motion, LaMere did not object to the computerized method utilized to randomly draw the names of prospective jurors for his trial, but to the jury clerk's use of the telephone to summon those prospective jurors into court. LaMere argued that the clerk's telephone-dependent method of summoning prospective jurors failed to substantially comply with Montana statutes governing the impaneling of a trial jury because the clerk failed to either serve by mail or have the sheriff personally serve those persons drawn for possible jury duty in his trial. LaMere also alleged that his constitutional right to trial by a fair and impartial jury had been violated in that the telephone-dependent method of summoning prospective jurors resulted in an "[a]rbitrary removal and de facto screening" of the venire when a prospective juror did not receive, answer, or return the clerk's call.

¶6 On the morning of the scheduled hearing, LaMere filed a motion to supplement the record and accompanying brief. LaMere supplemented the record on his motion to strike the jury panel with statistics from the United States Census Bureau showing percentages of persons living below the poverty line in Cascade County, including Native Americans, who are without telephone service.[(1)]

> These statistics revealed a substantial discrepancy regarding the availability of phone service between those persons living above and below the poverty line in Cascade County. LaMere's statistics showed that, of the 25,731 households in Cascade County living above the poverty line, only 3% (741 households) have no phone service. In contrast, of the 4,402 households in Cascade County living below the poverty line, 21% (935 households) have no phone service.

¶7 In Cascade County, Native Americans constitute the single largest minority group, outnumbering African Americans,

Asian Americans, and other racial or ethnic groups. LaMere's statistics showed an even more significant statistical disparity in access to telephone service between Anglo American and Native American races living in Cascade County, particularly when factoring in poverty. Of the 904 total Native American households in Cascade County living above or below the poverty line, 29% (262 households) have no phone service. Even more dramatically, 51% of Native American households in Cascade County live below the poverty line and, of those 458 households, 44% (203 households) have no phone service. In stark contrast, of the 28,577 total Anglo American households living above or below the poverty line in Cascade County, only 5% (1,379 households) are without phone service. Moreover, 13% of Anglo American households in Cascade County live below the poverty line and, of those 3,827 households, 19% (719 households) have no phone service.

¶8 In his motion to supplement the record, LaMere also introduced the affidavit of Joe Seipel (Seipel), statistician, as an exhibit. After reviewing the telephone-dependent technique used to summon jurors in Cascade County, Seipel opined that:

> The sampling procedures used to [summon] jurors are biased because the methods used exclude people from households that do not have a telephone. Those most likely to be excluded because they have no telephone are below poverty persons (21% below poverty versus 3% above poverty . . . ). This has two ramifications. First, by eliminating from the jury pool households without phones, below poverty households are seven times more likely to be excluded from jury participation (3% above poverty vs. 21% below poverty level without phones). Second, by eliminating from the jury pool households without phones, the ratio of households above or below the poverty [sic] shifts. That is to say, by using some jury notification

procedure which intentionally excludes households without phones the percentage possibility of a person from a below poverty household being chosen for jury duty is 4,402/30,133, or 15%. By eliminating those households without phones, the sample shifts in favor of persons from above poverty households to a chance of 3,467/28,457, or 12%. In the converse, persons in above poverty households obtain a corresponding advantage in being selected for jury duty from 85% to 88%.

This bias violates basic sampling theory because it permits a 6% shift from the population sampled. In my opinion, the 6% shift renders invalid the sampling procedure used for jury notification because it is not representative nor is it random. . . .

¶9 At the hearing on his motion to strike the jury panel, LaMere examined Lisa Gomez (Gomez), the jury clerk for the District Court. Gomez testified that she is employed by the District Court between the hours of 8:00 a.m. and 5:00 p.m., Monday through Friday, and that the jurors for LaMere's trial were summoned exclusively by phone calls she made between those working hours. Gomez further testified that she had not mailed a written jury summons to any of the prospective jurors in this case, and that she had not requested that the sheriff personally serve notice of LaMere's trial on those persons whom she was unable to contact by telephone.

¶10 Utilizing the clerk's personal notes regarding the 200-person panel drawn for trial, LaMere examined Gomez about those jurors whom she was unable to summon by telephone. This examination showed that seventy eliminations from possible jury service in LaMere's trial occurred through the use of the " 'phone-only' system" for notifying prospective jurors: (1) twenty-three prospective jurors were not summoned because they had no work or home phone number

listed on their juror questionnaire; (2) twelve prospective jurors were not summoned because there was no answer to the clerk's call; (3) twelve prospective jurors were not summoned because a message left by the clerk on an answering machine or voice mail was not returned; (4) eighteen prospective jurors were not summoned because, after the clerk left a message with an unnamed third person at the juror's residence or workplace, no response was obtained; (5) four prospective jurors were not summoned because, after speaking with an unnamed third person at the juror's residence or workplace, the clerk was informed that that juror was out of town on business or vacation and would not return in time for trial; and (6) one prospective juror was not summoned because that juror was hearing impaired and the clerk did not utilize a special telephone.

¶11 The District Court denied LaMere's motion to strike the jury panel. The court found that the telephone summoning procedure was "reasonable," and that the statutory term "summon" did not require the mailing or personal service of a written jury summons. The court reasoned that the absence of any notice to some of the prospective jurors in LaMere's trial resulting from the telephone summoning procedure had not created "any prejudice" because LaMere had failed to adduce any "evidence of a systematic exclusion of any racial, gender, social, economic or other group" from the venire.

¶12 During the initial questioning of prospective jurors, LaMere renewed his motion to strike the jury panel on the ground of gender bias. Since the first group of prospective jurors to be questioned consisted of twenty women and seven men, LaMere asserted that the telephone-dependent procedure for summoning prospective jurors resulted in an arbitrary three-to-one ratio in favor of women. LaMere argued that he was prejudiced by the gender makeup of the venire because women--especially retired, white women--were more likely to

be home between the hours of 8:00 a.m. and 5:00 p.m., and because those prospective jurors who had been excusing themselves from possible jury service by not returning the clerk's telephone calls were mostly men. The District Court again denied LaMere's motion. LaMere appeals.

*DISCUSSION*

¶13 Did the District Court err in concluding that LaMere failed to show that the exclusive use of the telephone to summon prospective jurors prejudiced his substantial rights to a jury drawn and summoned according to law?

¶14 The District Court's denial of LaMere's motion to strike the venire involves a conclusion of law. We review a trial court's conclusion of law to determine whether it is correct. State v. Anderson (1997), 282 Mont. 41, 43, 934 P.2d 1037, 1038.

¶15 The State concedes at the outset that our recent decision in State v. Robbins, 1998 MT 297, 292 Mont. 23, 971 P.2d 359, "is controlling" with regard to whether the telephone-dependent method of summoning prospective jurors substantially complies with Montana law. Like the defendant in *Robbins*, LaMere relies principally upon § 3-15-505, MCA (1997).[(2)] Section 3-15-505, MCA (1997), provides:

> The clerk shall serve notice by mail on the persons drawn as jurors and require response thereto by mail as to their qualifications to serve as trial jurors. He [or she] may attach to the notice a jury questionnaire and a form for an affidavit claiming an excuse as provided for in 3-15-313. If a person fails to respond to the notice, the clerk shall certify the failure to the sheriff, who shall then serve notice personally on such person and require a response to the notice.

Section 3-15-505, MCA (1997).

¶16 In *Robbins*, the defendant challenged the telephone-dependent summoning process

utilized in Cascade County as failing to substantially comply with § 3-15-505, MCA (1997), in that it failed to serve prospective jurors with a jury summons. We agreed, concluding that:

> The clerk, in relying solely upon the telephone to summon jurors, failed to either serve by mail or to serve personally those jurors whose names had been drawn for Robbins' trial, in violation of § 3-15-505, MCA. We hold that the District Court erred in impliedly finding substantial compliance with the statutory procedure for summoning jurors.

*Robbins, ¶ 51.*

¶17 We hold that the telephone summoning of jurors failed, as in *Robbins*, to substantially comply with § 3-15-505, MCA (1997). The plain language of § 3-15-505, MCA (1997), does not permit the clerk to utilize the telephone in summoning a <u>new</u> panel or array of trial jurors.[(3)] The District Court erred in concluding that the statutes on impaneling a trial jury do not require the mailing or personal service of a written jury summons to prospective jurors. They plainly do, and have long imposed such a requirement. *See, e.g.*, State *ex rel*. Clark v. District Court (1930), 86 Mont. 509, 512, 284 P. 266, 267 (citing § 8910, RCM (1921), a predecessor to § 3-15-505, MCA (1997), under which the sheriff was required to summon jurors drawn for trial either by "written notice" through the mail or by "personal notice" served upon the person) (analyzing how summoning the persons whose names have been drawn is a mandatory "step" in properly impaneling an array of trial jurors).[(4)]

¶18 However, in *Robbins*, we ultimately affirmed the trial court. In so doing, we accepted the State's contention that under Montana's harmless error statute, § 46-20-701, MCA, the failure to properly summon jurors had not prejudiced the defendant's right to a fair and impartial jury. We reasoned:

> [T]he State correctly asserts that this Court may not reverse the District Court's order denying Robbins' motion to discharge the venire "unless the record shows that the error was prejudicial." Section 46-20-701(1), MCA. In response, Robbins argues that the failure to personally serve and require a response from those jurors whose names had been drawn for jury duty resulted in "the exclusion from the venire of those persons who could not afford a telephone."

Robbins provides this Court with no actual evidence that people of "low economic and social status" were necessarily excluded from the venire, resulting in a jury lacking in impartiality in this case. Robbins' argument is premised upon an assumption that those persons whom the clerk was unable to contact by telephone were too poor to afford a telephone. However, in the absence of any evidence to support this assumption, one can just as easily assume that these individuals possessed telephones but were not at home when the clerk called; or that they had answering machines but did not return the clerk's call; or that they possessed a telephone but had an unlisted phone number. An error by a trial court that "does not affect substantial rights must be disregarded." Section 46-20-701(2), MCA. We hold that Robbins has failed to demonstrate that the District Court order denying his motion to strike the jury panel resulted in actual prejudice affecting his substantial rights.

*Robbins, ¶¶ 52-53 (footnote omitted).*

¶19 LaMere, like the defendant in *Robbins*, relies on a long line of Montana cases holding that a failure to substantially comply with the statutory procedures governing jury selection amounts to a denial of a defendant's fundamental constitutional right to trial by a fair and impartial jury, and is therefore *per se* reversible without any proof of individual prejudice. *See generally* Solberg v. County of Yellowstone (1983), 203 Mont. 79, 659 P.2d 290; Dvorak v. Huntley Project Irrigation Dist. (1981), 196 Mont. 167, 639 P.2d 62; State v. Deeds (1957), 130 Mont. 503, 305 P.2d 321; State v. Porter (1952), 125 Mont. 503, 242 P.2d 984; State v. Hay (1948), 120 Mont. 573, 194 P.2d 232; State v. Diedtman (1920), 58 Mont. 13, 190 P. 117; State v. Miller (1914), 49 Mont. 360, 141 P. 860; State v. Groom (1914), 49 Mont. 354, 141 P. 858; State v. Landry (1903), 29 Mont. 218, 74 P. 418; State v. Tighe (1903), 27 Mont. 327, 71 P. 3; Kennon v. Gilmer (1882), 4 Mont. 433, 2 P. 21.

¶20 However, none of the aforementioned cases applying the substantial compliance standard of reversal was decided in the context of Montana's harmless error statute, § 46-20-701, MCA, as was the recent *Robbins* decision. Nonetheless, LaMere contends that this Court erred in applying the harmless error standard in *Robbins* and in requiring, in addition to a substantial failure to comply with statutory law, a showing of prejudice by the defendant in order to sustain a challenge to the jury panel. Thus, to the extent that the decision requires a showing of "actual prejudice" by the defendant, LaMere asks this Court to overrule *Robbins*.

¶21 Other than contending that this Court ignored established precedent in deciding *Robbins*, LaMere provides this Court with no convincing rationale as to why a statutory violation in the procurement of a trial jury should not be amenable to harmless error review pursuant to § 46-20-701, MCA. From the beginning of the American Republic until well into the Twentieth Century, American courts generally operated under the Exchequer Rule borrowed from English law that any error in the trial court proceedings, regardless of how trivial, mandated appellate reversal. *See* Roger J. Traynor, *The Riddle of Harmless Error* 6-8 (1970). However, it is no longer presumed that simply because an error is committed it is prejudicial. The United States Supreme Court has had occasion to comment on this jurisprudential evolution:

> We have . . . come a long way from the time when all trial error was presumed prejudicial and reviewing courts were considered " 'citadels of technicality.' " Kotteakos v. United States, 328 U.S. 750, 759[, 66 S.Ct. 1239, 1245, 90 L.Ed. 1557, 1563] (1946), quoting Kavanagh, Improvement of Administration of Criminal Justice by Exercise of Judicial Power, 11 A.B.A. J. 217, 222 (1925). The harmless-error rules . . . embody the principle that courts should exercise judgment in preference to the automatic reversal for "error" and ignore errors that do not affect the essential fairness of the trial.

McDonough Power Equip., Inc. v. Greenwood (1984), 464 U.S. 548, 553, 104 S.Ct. 845, 848, 78 L.Ed.2d 663, 669-70.

¶22 Particularly since the U.S. Supreme Court's seminal ruling in Chapman v. California (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, a rule of automatic reversal has applied to an increasingly limited class of constitutional violations, thus becoming the exception and not the rule of appellate review. We note that none of the U.S. Supreme Court's pronouncements since *Chapman* has expressly held, at least in the absence of intentional discrimination, that a failure to draw and summon a trial jury according to statutory law is not amenable to harmless error review.

¶23 Indeed, the Court has found constitutional errors to be to be "structural," and thus subject to automatic reversal, "only in a very limited class of cases." Johnson v. United States (1997), 520 U.S. 461, 468-69, 117 S.Ct. 1544, 1549-50, 137 L.Ed.2d 718, 728 (citing Gideon v. Wainright (1963), 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (total deprivation of the right to counsel); Tumey v. Ohio (1927), 273 U.S. 510, 47 S.Ct. 437, 71

L.Ed. 749 (lack of an impartial trial judge); Vasquez v. Hillery (1986), 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (discriminatory exclusion of grand jurors of defendant's race); McKaskle v. Wiggins (1984), 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (denial of the right to self-representation at trial); Waller v. Georgia (1984), 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (denial of the right to a public trial); Sullivan v. Louisiana (1993), 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (erroneous reasonable-doubt instruction given to jury)).

¶24 The State urges this Court to retain *Robbins*' requirement of actual prejudice, under which the State contends that LaMere has failed to make a sufficient showing that the statutory violations in this case actually affected the composition of the trial jury or otherwise prejudiced his substantial rights. Thus, the State encourages this Court to affirm the District Court's denial of LaMere's motion to strike the venire, and hold that LaMere has failed to demonstrate reversible error pursuant to § 46-20-701, MCA.

¶25 However, after doing extensive research far beyond that submitted by the parties, we choose to overrule *Robbins* and return to a *per se* rule of reversal for a failure to substantially comply with Montana statutes governing the procurement of a trial jury. In overruling *Robbins*' requirement of prejudice, we seek to clarify and refine upon the substantial compliance standard. Our decision today turns upon the United States Supreme Court's contemporary distinction between "trial error," to which harmless error review applies, and "structural error," to which harmless error review is inapplicable.

¶26 As discussed hereafter, an automatic rule of reversal should prevail because errors in the jury selection process are "structural" in nature and, therefore, affect the very framework within which a trial proceeds. That is, they are errors which indelibly affect the essential fairness of the trial itself. Since such errors precede the introduction of any evidence at trial, the very premise of harmless error review--that a so-called "trial error" can be assessed by a reviewing court for prejudicial impact relative to the other evidence introduced at trial--is absent. Therefore, to engage in harmless error review of a statutory violation in jury selection merely invites abstract and unguided speculation about the possibility of prejudice in an individual case; it is pure conjecture as to whether a properly selected jury would have decided a case differently than an improperly selected jury actually decided the case.

¶27 In addition to recognizing that the subtle, interpersonal dynamics of the jury system are among life's sweet imponderables, this Court finds a *per se* rule of reversal appropriate

as a matter of public policy. Montana statutes governing the procurement of a trial jury exist to secure rights deemed fundamental to our system of justice by minimizing and, indeed, preempting the violation of such fundamental rights from the outset of a trial. The substantial compliance standard vindicates not only the rights of the individual defendant, but also the rights of the public in ensuring that the jury system remains inviolate.

## *I Introduction: Diversity Begets Impartiality*

¶28 "Our notions of what a proper jury is have developed in harmony with our basic concepts of a democratic society and a representative government." Glasser v. United States (1942), 315 U.S. 60, 85, 62 S.Ct. 457, 472, 86 L.Ed. 680, 707, *superseded on other grounds by statute as recognized by* Bourjaily v. United States (1987), 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144. Since the time of the Magna Carta, "trial by jury has been a prized shield against oppression . . . [and] the approaches of arbitrary power." *Glasser*, 315 U.S. at 84, 62 S.Ct. at 471, 86 L.Ed. at 706-07. The individual entitlement to trial by jury, long thought to be a safeguard against tyranny, is now embodied in all of our state constitutions as a fundamental right. *Glasser*, 315 U.S. at 84, 62 S.Ct. at 471, 86 L.Ed. at 707.

¶29 That the right to trial by jury is a jealously protected safeguard against government oppression has been perhaps no more eloquently expressed than in Duncan v. Louisiana (1968), 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491:

> The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which the law should be enforced and justice administered. A right to jury trial is granted to all criminal defendants in order to prevent oppression by the Government. Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority. The framers of the constitution strove to create an independent judiciary but insisted upon further protection against arbitrary action. Providing an accused with the right to be tried by a jury of his [or her] peers gave him [or her] an inestimable safeguard against the corrupt overzealous prosecutor and against the compliant, biased, or eccentric judge. . . . [T]he jury trial provisions . . . reflect a fundamental decision about the exercise of official power--a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges. Fear of unchecked power . . . found expression in the criminal law

<u>in this insistence upon community participation in the determination of guilt or innocence</u>. [Emphasis added.]

*Duncan*, 391 U.S. at 155-56, 88 S.Ct. at 1451, 20 L.Ed.2d at 499-500 (footnote omitted).

¶30 To guard against arbitrary injustice, as this Court has acknowledged, " '[i]t is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community.' " State v. Taylor (1975), 168 Mont. 142, 145-46, 542 P.2d 100, 102 (quoting Smith v. Texas (1940), 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84, 86). The selection of qualified jurors, therefore, "must always accord with the fact that the proper functioning of the jury system, and, indeed, our democracy itself, requires that the jury be a 'body truly representative of the community,' and not the organ of any special group or class." *Glasser*, 315 U.S. at 86, 62 S.Ct. at 472, 86 L.Ed. at 707.

¶31 As this Court long ago observed:

The law does not seek merely to obtain a sufficient number of [persons] to constitute a trial jury. It is concerned with the composition of the jury. Its purpose is to have in attendance upon the court [persons] suited for jury service drawn from the various walks of life.

State v. Carroll (1930), 87 Mont. 45, 51, 284 P. 1008, 1010. Underlying this observation is the belief in American jurisprudence that a jury constituted of individuals with diverse perspectives, coming from the various classes of society, is greater than the sum of its respective parts and can better arrive at a common sense judgment about a set of facts than can any individual. Our jury system, no less than our system of representative government, is based upon a democratic ideal: that justice is best served by a broadly representative group of individuals "drawn from the various walks of life." In short, it is believed that diversity begets impartiality.

## II The Statutory Procedures Secure the Fundamental Right to an Impartial Jury

¶32 Next, we seek to illuminate the underlying constitutional rights protected by the statutory procedures governing jury selection. Under this Court's case law, the statutory procedures have been construed as designed " 'to carry out the constitutional guarantee' " of " ' "a speedy, public trial by an impartial jury." ' " *Deeds*, 130 Mont. at 510-11, 305 P.2d

at 325 (quoting *Porter*, 125 Mont. at 506, 242 P.2d at 986 (quoting Art. III, Sec. 16, Mont. Const. (1889))). A defendant's statutory right to challenge the jury panel[5] for a substantial failure to comply with the law governing jury selection is but "a legislative amplification of the constitutional . . . right to 'a speedy, public trial by an impartial jury.' " *Groom*, 49 Mont. at 359, 141 P. at 858. That the " 'jury shall be selected according to methods established' " is intended " 'to secure a just and impartial administration of the jury system.' " *Diedtman*, 58 Mont. at 18, 190 P. at 118-19 (quoting People v. McQuade (N.Y. 1888), 18 N.E. 156, 165). Since "a substantial compliance is necessary in order to meet the constitutional requirement," a defendant is therefore entitled "to a [jury] panel drawn in substantial conformity with the requirements of statute." *Landry*, 29 Mont. at 223-24, 74 P. at 420.

¶33 The Montana Constitution guarantees that every criminal defendant has a fundamental right to a speedy public trial by an impartial jury. *See* Woirhaye v. Montana Fourth Jud. Dist. Court, 1998 MT 320, ¶¶ 11, 16, 292 Mont. 185, ¶¶ 11, 16, 972 P.2d 800, ¶¶ 11, 16 (citing Article II, Sections 24 and 26 of the Montana Constitution). To secure this constitutional guarantee,

> [t]he rule is that a defendant has a right to a fair and impartial jury selected from the proper place and drawn and summoned according to law. The systematic . . . exclusion of a class of persons . . . deprives a defendant of fundamental constitutional rights.

State v. Coleman (1978), 177 Mont. 1, 26, 579 P.2d 732, 747 (citing *Hay*, 120 Mont. 573, 194 P.2d 232).

¶34 As we have noted, "[a]n impartial jury is described in the numerous cases as one in which the potential membership is drawn from a 'cross section of the community.' " *Taylor*, 168 Mont. at 145, 542 P.2d at 101. Accordingly, the underlying "purpose of the jury selection statutes is to provide <u>random selection</u> of jurors from the entire panel or array, . . . thus securing a fair and impartial jury." Tribby v. Northwestern Bank of Great Falls (1985), 217 Mont. 196, 207, 704 P.2d 409, 416 (citing Dvorak v. Huntley Irr. Dist. (1981), 196 Mont. 167, 170, 639 P.2d 62, 64) (emphasis added).

¶35 In short, the objective procedures established by the Montana Legislature for the random selection of jurors are intended to protect a criminal defendant's fundamental right to a fair and impartial jury, as guaranteed by Article II, Sections 24 and 26 of the Montana

Constitution and by the Sixth and Fourteenth Amendments to the United States Constitution. We construe the substantial compliance standard as being designed to protect a defendant's fundamental right to an impartial jury, primarily, by encouraging reasonably strict compliance with statutory procedures intended to implement, and thereby secure, the fair cross-section guarantee of the Sixth Amendment.

¶36 Montana has long adhered to the fair cross-section requirement as fundamental. *Taylor*, 168 Mont. at 146, 542 P.2d at 102. The fair cross-section guarantee is an "essential component" of the Sixth Amendment, which applies to the states vis-à-vis the Fourteenth Amendment and entitles a defendant to "the selection of a petit jury from a representative cross section of the community . . . ." *Taylor*, 168 Mont. at 146, 542 P.2d at 102.

¶37 "A fair cross section of the community must be represented on [a jury] panel to fulfill the Sixth Amendment's guaranty of an impartial jury in criminal prosecutions." State v. Stewart (1977), 175 Mont. 286, 293, 573 P.2d 1138, 1142. Thus, this Court has acknowledged that although a defendant has no right to have a particular juror sit on the case, a defendant is "entitled to a fair cross section of the jury <u>panel</u>" from which the petit jury is chosen. State v. Gollehon (1993), 262 Mont. 1, 11, 864 P.2d 249, 255 (citing Lockhart v. McCree (1986), 476 U.S. 162, 174, 106 S.Ct. 1758, 1764, 90 L.Ed.2d 137, 148); *accord Taylor*, 168 Mont. at 146, 542 P.2d at 102 (while the fair cross-section requirement is fundamental, a defendant is only "entitled to an impartial jury, not a particular juror"); *see also Tribby*, 217 Mont. at 208, 704 P.2d at 416 ("Montana case law has consistently held that a party has no right to have a particular member of the panel sit on a case.").

¶38 Consistent with the belief in American jurisprudence that diversity begets impartiality, it has been said that a "policy of inclusiveness" underlies the Sixth Amendment's fair cross-section of the community criterion. *See* Davis v. Warden, Joliet Corr. Inst. at Statesville (7th Cir. 1989), 867 F.2d 1003, 1013. To minimize violations of the fair cross-section guarantee, the statutory procedures establish objective methods for the random selection of trial jurors in Montana. These objective procedures, by seeking to eliminate as far as possible the vagaries of human subjectivity and arbitrariness from the jury selection process, secure a defendant's fundamental right to an impartial jury by ensuring that the selection process results in a jury panel or venire consisting of a fair cross-section of the community.

### III Jury Selection Errors are Structural in Nature

¶39 Having established that the statutory procedures primarily serve to ensure that jury panels will be selected, drawn, and summoned in a manner that reflects a fair cross-section of the community, we now turn to the question of whether a transgression of the Sixth Amendment's fair cross-section guarantee is amenable to harmless error review. Before a federal constitutional error can be held harmless under *Chapman*, the reviewing "court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828, 17 L.Ed.2d at 710-11.

¶40 In Satterwhite v. Texas (1988), 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284, the U. S. Supreme Court distinguished between those Sixth Amendment transgressions that are subject to harmless error review and those violations that trigger a rule of automatic reversal: "We have permitted harmless error analysis in both capital and noncapital cases where the evil caused by a Sixth Amendment violation is limited to the <u>erroneous admission of particular evidence at trial</u>." *Satterwhite*, 486 U.S. at 257, 108 S.Ct. at 1798, 100 L.Ed.2d at 294 (emphasis added). However, some constitutional violations "by their very nature cast so much doubt on the fairness of the trial process that, as a matter of law, they can never be considered harmless. Sixth Amendment <u>violations that pervade the entire proceeding</u> fall within this category." *Satterwhite*, 486 U.S. at 256, 108 S.Ct. at 1797, 100 L.Ed.2d at 293 (emphasis added). Examples include a conflict of interest in representation throughout an entire trial, a total deprivation of counsel throughout an entire proceeding, and the absence of counsel from an arraignment proceeding that affected the entire trial because defenses not asserted were irretrievably lost. *See Satterwhite*, 486 U.S. at 256, 108 S.Ct. at 1797, 100 L.Ed.2d at 293-94 (citing Holloway v. Arkansas (1978), 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426; Gideon v. Wainright (1963), 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799; White v. Maryland (1963), 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193).

¶41 The impact of these types of violations on the trial process, as the Court has explained, "cannot be discerned from the record" and is so "purely speculative" that a presumption of prejudice obtains:

> " 'In the normal case where a harmless-error rule is applied, the error occurs at trial and its scope it readily identifiable. Accordingly, the reviewing court can undertake with some confidence its relatively narrow task of assessing the likelihood that the error materially affected the deliberations of the jury. . . . [In the examples of violations cited above, however,] any inquiry into a claim of harmless error . . . would require, unlike most cases, unguided speculation.' "

*Satterwhite, 486 U.S. at 256-57, 108 S.Ct. at 294, 100 L.Ed.2d at 1797 (quoting Holloway, 435 U.S. at 490-91, 98 S.Ct. at 1182, 55 L.Ed.2d at 438).*

¶42 In short, "trial error" is subject to harmless error review while "structural error" is not. The question is whether an improperly selected jury is the type of Sixth Amendment violation that pervades the entire trial process (i.e., "structural"), making any inquiry into harmless error impossible to discern from the record and, thus, purely speculative. For the reasons set forth below, we conclude that a violation that undermines the fair cross-section guarantee is "structural" in nature and, for that reason, not amenable to harmless error review.

¶43 Since the 1967 *Chapman* decision, the U.S. Supreme Court "has recognized that most constitutional errors can be harmless." Arizona v. Fulminante (1991), 499 U.S. 279, 306, 111 S.Ct. 1246, 1263, 113 L.Ed.2d 302, 329. "Accordingly, if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis." Rose v. Clark (1986), 478 U.S. 570, 579, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460, 471. As mentioned previously, only a limited class of constitutional violations--"structural errors"--are entitled to a presumption of prejudice. *See Fulminante*, 499 U.S. at 307-10, 111 S.Ct. at 1264-65, 113 L.Ed.2d at 330-31.

¶44The *Fulminante* Court cited a string of sixteen cases in which constitutional violations have been deemed harmless, including the following categories of violations: (1) unconstitutionally overbroad jury instructions at the sentencing stage of a capital case; (2) admission of evidence at the sentencing stage of a capital case in violation of the Sixth Amendment Counsel Clause; (3) jury instruction containing an erroneous conclusive presumption; (4) jury instruction misstating an element of the offense; (5) jury instruction containing an erroneous rebuttable presumption; (6) erroneous exclusion of defendant's testimony regarding the circumstances of his or her confession; (7) restriction on a defendant's right to cross-examine a witness for bias in violation of the Sixth Amendment Confrontation Clause; (8) denial of a defendant's right to be present at trial; (9) improper comment on defendant's silence at trial, in violation of the Fifth Amendment Self-Incrimination Clause; (10) statute improperly forbidding trial court giving a jury instruction on a lesser included offense in a capital case in violation of the Due Process Clause; (11) failure to instruct the jury on the presumption of innocence; (12) admission of identification evidence in violation of the Sixth Amendment Confrontation Clause; (13) admission of the out-of-court statement of a non-testifying co-defendant in violation of the

Sixth Amendment Confrontation Clause; (14) confession obtained in violation of the *Massiah* rule; (15) admission of evidence obtained in violation of the Fourth Amendment; (16) denial of counsel at a preliminary hearing in violation of the Sixth Amendment Counsel Clause. *See Fulminante*, 499 U.S. at 306-07, 111 S.Ct. at 1263, 113 L.Ed.2d at 329-30 (citing cases).

¶45The common thread connecting these cases is that each involved what the Court calls "trial error"--error which occurred during the presentation of the case to the jury, and which can therefore be quantitatively assessed in the context of the other evidence introduced at trial to determine whether it was harmless beyond a reasonable doubt. As can be seen from the foregoing list of trial errors, a violation of the Sixth Amendment right to a fair cross-section has not been determined to be subject to harmless error review by the U.S. Supreme Court.[6]

¶46 In *Fulminante*, the U.S. Supreme Court set forth three definitions of the "trial error"/"structural error" dichotomy which guide our inquiry. First, in what has been labeled the "evidentiary definition," the Court stated that a trial error is that "which may . . . be quantitatively assessed in the context of other evidence presented." *Fulminante*, 499 U.S. at 307-08, 111 S.Ct. at 1264, 113 L.Ed.2d at 330; David McCord, *The "Trial"/"Structural" Error Dichotomy: Erroneous, and Not Harmless*, 45 U. Kan. L. Rev. 1401, 1412 (1997). As suggested earlier, it is impossible to quantitatively assess the prejudicial impact of an improperly impaneled jury in the context of the evidence at trial. Indeed, harmless error review presupposes an "impartial adjudicator" and then looks to whether the error (typically evidentiary in nature) would have fundamentally affected the jury's deliberations, regardless of the other evidence presented at trial. However, it is pure speculation as to whether an improperly selected jury would have viewed the evidence at trial differently than a properly selected jury:

> It is in the nature of the practices here challenged that proof of actual harm, or lack of harm, is virtually impossible to adduce. For there is no way to determine what jury would have been selected under a constitutionally valid selection system, or how that jury would have decided the case. Consequently, it is necessary to decide on principle which side shall suffer the consequences of unavoidable uncertainty.

Peters v. Kiff (1972), 407 U.S. 493, 504, 92 S.Ct. 2163, 2169, 33 L.Ed.2d 83, 94-95 (vacating, on due process grounds, the conviction of a white man who was tried by a jury from which black persons were discriminatory excluded). Thus, the first *Fulminante*

definition suggests that a fair cross-section violation would not be amenable to harmless error review.

¶47 Second, in *Fulminante*, the Court set forth what has been captioned the "durational definition" of trial error: an error that occurs "during the presentation of the case to the jury." *Fulminante*, 499 U.S. at 307, 111 S.Ct. at 1264, 113 L.Ed.2d at 330; McCord, *The "Trial"/"Structural" Error Dichotomy*, 45 U. Kan. L. Rev. at 1414. Obviously, an error in jury selection occurs prior to the presentation of any evidence to the jury and, therefore, cannot be said to be a trial error under the second *Fulminante* definition.

¶48 Lastly, the Court defined structural error in terms of what has been called the "revived *Chapman* approach": a structural defect is an error that "affect[s] the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Fulminante*, 499 U.S. at 310, 111 S.Ct. at 1265, 113 L.Ed.2d at 331; McCord, *The "Trial"/"Structural" Error Dichotomy*, 45 U. Kan. L. Rev. at 1415. Again, as alluded to under the second definition above, an improperly selected trial jury constitutes an error which precedes the presentation of any evidence at trial. In short, it is not a trial error, but a structural error which affects the very framework within which the trial proceeds. Since the error predates the admission of any evidence, it is purely speculative to attempt to assess the impact of the error in the context of the evidence presented at trial to determine whether it was harmless beyond a reasonable doubt. The third *Fulminante* definition clearly supports a *per se* rule of reversal for a statutory violation that affects the fair cross-section guarantee.

¶49 In closing, a quote from Gray v. Mississippi (1987), 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622, represents yet another rationale supporting the conclusion that an improperly selected jury constitutes structural error:

> Because . . . the <u>impartiality of the adjudicator goes to the very integrity of the legal system</u>, the *Chapman* harmless-error analysis cannot apply. We have recognized that "some constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error." *Chapman* [, 386 U.S. at 23, 87 S.Ct. at 827-28, 17 L.Ed.2d at 710]. <u>The right to an impartial adjudicator, be it judge or jury, is such a right</u>. [*Chapman*, 386 U.S. at 23 n.8, 87 S.Ct. at 828 n.8, 17 L.Ed.2d at 710 n.8 (citing, among other cases, Tumey v. Ohio (1927), 273 U.S. 510, 47 S.Ct. 437, 71 L. Ed. 749, in which the Court held that lack of an impartial judge can never be considered harmless error).] [Emphasis added.]

*Gray, 481 U.S. at 668, 107 S.Ct. at 639, 95 L.Ed.2d at 2057 (plurality opinion).*

¶50 In summary, then, a material failure to substantially comply with Montana statutes governing the procurement of a trial jury cannot be treated as harmless error for the following reasons: (1) such an error precedes the presentation of any evidence to the jury, and cannot be analyzed as mere trial error without resorting to speculation; (2) such an error, because it precedes the trial process, cannot be quantitatively assessed for its prejudicial impact relative to the evidence introduced at trial; (3) such an error, being other than an error in the trial process, affects the very framework within which the trial proceeds; and (4) the impartiality of the jury goes to the very integrity of our justice system, and the right to an impartial jury is so essential to our conception of a fair trial that its violation cannot be considered harmless error.

### IV Section 46-20-701, MCA, is Inapplicable to Structural Errors

¶51 Montana's harmless error statute provides that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Section 46-20-701(2), MCA. A plain language argument can be made that § 46-20-701, MCA, is inapplicable to the right to trial by an impartial jury because that right is fundamental and the statute, by its plain terms, applies only to an error that "does not affect substantial rights." As the argument goes, since the right to a jury trial is a substantial, indeed fundamental right, it must not be disregarded under the harmless error statute. This position is, however, unworkable and unsound because it invites the notion that all constitutional rights, being substantial, are not amenable to harmless error review. Such a position would run contrary to the actuality, as illustrated herein, that most constitutional rights have been found to be subject to the harmless error standard.

¶52 The distinction between trial and structural error provides a much more cohesive rationale as to why § 46-20-701, MCA, does not apply to certain types of constitutional violations. Under Montana's harmless error statute, this Court is prohibited from reversing a judgment and verdict "unless <u>the record</u> shows that the error was prejudicial." Section 46-20-701(1), MCA (emphasis added). To warrant reversal, the convicted person's substantial rights must have been prejudicially affected, "as shown <u>upon the record</u>." Section 46-20-701(1), MCA (emphasis added).

¶53 Thus, the harmless error statute is inapplicable to structural errors, such as an error in the jury selection process, because these types of errors cannot be assessed by this Court

against "the record" for "prejudicial" impact. A structural error precedes the trial process and, therefore, cannot be quantitatively weighed against the evidence introduced at trial to determine whether the defendant was prejudiced by the error. That is, the very premise of harmless error review is simply absent. To echo the words of *Chapman*, this Court cannot say with any degree of certainty that such an error is "harmless beyond a reasonable doubt."

¶54 In closing, as this Court has observed of the substantial compliance standard:

> The fact that no actual prejudice has been shown is irrelevant. Whether a different verdict would have resulted had the statutory procedures been followed is purely speculative, conjectural and impossible to determine. The District Court went well beyond a mere technical departure from the jury selection statutes and this type of departure necessitates the reversal of the verdict and a retrial with a jury selected in the proper manner. [Emphasis added.]

*Dvorak, 196 Mont. at 172, 639 P.2d at 65.*

### V Clarifying the Substantial Compliance Standard

¶55 The question that obviously arises is whether this Court must reverse every case where a violation occurs in the statutory process governing the formation of a trial jury. The answer to this question is negative. Under this Court's case law, the substantial compliance standard is not an absolute rule; it permits minor deviations from statutory procedure. Such technical deviations do not constitute a substantial failure to comply and, therefore, do not give rise to a presumption of prejudice.

¶56 In clarifying the substantial compliance standard, we take guidance from federal case law developed under the Jury Selection and Service Act of 1968 (JSSA). *See generally* 28 U.S.C. §§ 1861-1878 (1994). Case law developed under the JSSA is instructive because the Act, like Montana law, utilizes a "substantial compliance" standard for reversal. In order to establish a violation under the JSSA, a defendant must show that the government substantially failed to comply with the methods set forth by statute for the selection of the jury. 28 U.S.C. § 1867(a) (1994).

¶57 "Substantial failure" has been construed as a violation that contravenes one of two basic principles under the JSSA: (1) random selection of jurors; and (2) determination of

juror disqualification, excuses, exemptions, and exclusion on the basis of objective criteria. United States v. Royal (1st Cir. 1999), 174 F.3d 1, 11. The statutes governing the selection of a trial jury in Montana ensure these same basic objectives--random selection of prospective jurors and determining juror competency and excuses on the basis of objective criteria. A substantial failure to comply encompasses a statutory violation that affects the "random nature or objectivity of the selection process." United States v. Kennedy (5th Cir. 1977), 548 F.2d 608, 612, *cert. denied*, 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140 (1977), *and overruled on other grounds by* United States v. Singleterry (5th Cir. 1982), 683 F.2d 122. Similarly, we construe the substantial compliance standard in Montana law as designed to protect the random nature and objectivity of the jury selection process.

¶58 In turn, technical violations--even numerous such violations--that do not frustrate these goals or result in discrimination and arbitrariness do not constitute a substantial failure to comply. *Royal*, 174 F.3d at 11. The fact that technical statutory violations generally are not reversible has led courts to observe that "Congress . . . left room for harmless error by providing that dismissal should lie only when there was a substantial failure to comply with the Act." United States v. Evans (5th Cir. 1976), 526 F.2d 701, 705 (first emphasis added); *see also* H.R. Rep. No. 90-1076 (1968) *reprinted in* 1968 U.S.C.C. A.N. 1792, 1805.

¶59 Similarly, as this Court has put it, "not every deviation, however slight, from the strict letter of the law in drawing or returning a jury will furnish ground for challenge to the panel. The statute in terms requires that the departure must be a material one." *Groom*, 49 Mont. at 359, 141 P. at 859 (emphasis added). " 'Where the disregard for legislative mandates amounts to more than technical irregularity substantial compliance has not been achieved.' " *Dvorak*, 196 Mont. at 171, 639 P.2d at 64 (quoting State v. Fitzpatrick (1977), 174 Mont. 174, 180-81, 569 P.2d 383, 389) (emphasis added); *accord* State v. Moran (1963), 142 Mont. 423, 447, 384 P.2d 777, 790 (quoting State v. Huffman (1931), 89 Mont. 194, 198, 296 P. 789, 790) (" 'Prejudice is not presumed from error, and we are commanded . . . to "give judgment without regard to technical errors . . . which do not affect the substantial rights of the parties." ' "). According to Commission Comments to § 46-16-112, MCA, a successful challenge to the jury panel can be founded only upon a "material departure from the law" with respect to the manner in which the jury was selected, drawn, or summoned. *See* Commission Comments to § 46-16-112, MCA (emphasis added).

¶60 Therefore, if the statutory violation is "substantial" or "material"--viewed in terms of the underlying principles of ensuring that jury venires are selected randomly and on the basis of objective criteria--then it cannot be considered non-prejudicial to the defendant. A departure from the statutory scheme that directly or materially affects the random nature or objectivity of the jury selection process establishes a substantial violation independently of the departure's consequences in an individual case. Conversely, a mere "technical" or "immaterial" violation--one that does not undermine the objective procedures designed to produce a jury venire consisting of a fair cross-section of the community--constitutes non-prejudicial error under the substantial compliance standard.

¶61 We determine that *Robbins*, by holding that telephone summoning of prospective jurors substantially failed to comply with § 3-15-505, MCA (1997), but that the statutory deviation constituted only harmless error, was wrongly decided. In short, the substantial/ technical dichotomy must be read as a harmful/harmless standard for reversal. Where the defendant shows that there has been a substantial or material deviation from statutory procedures--a violation that undermines the random nature or objectivity of the selection process--a presumption of prejudice obtains. A presumption of prejudice applies because, as we have explained, errors in the jury selection process are structural in nature. Having found a substantial failure to comply with the statutory procedures in *Robbins*, this Court should have found the error to be prejudicial (i.e., not harmless), thus warranting reversal. Therefore, to the extent that *Robbins* requires a showing of "actual prejudice" by the defendant to sustain a challenge to the jury panel under the substantial compliance standard, it is hereby expressly overruled.

### VI The Substantial Compliance Standard is Appropriate

### as a Matter of Public Policy

¶62 The State urges this Court to apply the three-pronged test for establishing a *prima facie* violation of the Sixth Amendment's fair cross-section guarantee to LaMere's appeal. *See* Duren v. Missouri (1979), 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579; Taylor v. Louisiana (1975), 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690; *see also* United States v. Esquivel (9th Cir. 1996), 88 F.3d 722; Kills on Top v. State (1995), 273 Mont. 32, 901 P.2d 1368; State v. Bradley (1993), 262 Mont. 194, 864 P.2d 787. The State claims that LaMere's "general statistics" fail to show the systematic exclusion of any distinctive group in the community and, therefore, fail to satisfy the *Duren* test. While the State is correct in arguing that LaMere's statistics do not satisfy the second, statistical prong of the *Duren* inquiry, the State's argument would misapply the constitutional test to an alleged statutory

violation. LaMere's challenge arises under the substantial compliance standard, not the Sixth Amendment itself. Although the statutory procedures for jury selection are designed to protect the constitutional, fair cross-section guarantee, the substantial compliance standard and the constitutional test have as their object of inquiry entirely different subject matters.

¶63 To illustrate, under *Taylor* and *Duren*, the fair cross-section test is designed to ensure that " 'jury wheels, pools of names, panels, or venires from which juries are drawn [do] not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.' " *Duren*, 439 U.S. at 363-64, 99 S.Ct. at 668, 58 L. Ed.2d at 586 (quoting *Taylor*, 419 U.S. at 538, 95 S.Ct. at 702, 42 L.Ed.2d at 703). In order to mount a successful challenge, a defendant must show that the underrepresentation of a distinctive group in the community on jury venires is due to systematic exclusion of the group in the jury selection process itself. *Duren*, 439 U.S. at 364, 99 S.Ct. at 668, 58 L. Ed.2d at 587. Such a showing demonstrates that "the cause of the underrepresentation was systematic--that is, inherent in the particular jury selection process utilized." *Duren*, 439 U. S. at 366, 99 S.Ct. at 669, 58 L.Ed.2d at 588 (emphasis added).

¶64 Therefore, the constitutional, fair cross-section test exists to challenge a "jury-selection system" that systematically excludes an identifiable class of citizens from jury service. *Taylor*, 419 U.S. at 525, 95 S.Ct. at 695, 42 L.Ed.2d at 695 (emphasis added). Here, LaMere's challenge is premised upon a material failure to comply with the statutory scheme; he is not challenging the jury-selection scheme itself as failing to comport with the Sixth Amendment. As LaMere correctly suggests, it is possible to have substantial compliance with a system for jury selection, statutory or otherwise, that nevertheless fails to satisfy the fair cross-section requirement of the Sixth Amendment. Therefore, *Duren* is inapposite to the challenge before this Court.

¶65 That a defendant faces a higher burden to sustain a constitutional challenge to the jury selection system itself than when challenging a failure to internally comply with the statutory scheme is immaterial. The substantial compliance standard for reversal implies that the legislative scheme established for jury selection is constitutionally valid. The statutory procedures protect against, and indeed preempt, violations of fundamental constitutional rights. In light of the presumption of constitutionality underlying the substantial compliance standard, a heightened burden to sustain a constitutional challenge is entirely rational. The statutory system governing jury selection is a prophylactic vehicle for protecting the underlying constitutional rights. However, the particular jury selection

procedures employed may, nonetheless, fail to satisfy constitutional requirements. The three-pronged *Duren* test exists as a safeguard to ensure that the jury selection system itself remains constitutionally valid, and this Court will continue to adhere to *Duren* where applicable.

¶66 The more lenient burden under the substantial compliance standard than under the constitutional standard of *Duren* is best explained on the grounds of public policy. Under this Court's case law, no prejudice need be shown where there has been a substantial failure to comply with the statutes governing the procurement of a trial jury, because a rule of automatic reversal protects the integrity of the jury system itself:

> It is not the right of the individual necessarily involved, but rather the entire jury system and the selection procedures which must be protected, and when a showing is timely brought before this [C]ourt we would be remiss in our duties if we permitted material deviation or departure from the procedures spelled out by the legislature.

State *ex rel*. Henningson v. District Court (1959), 136 Mont. 354, 360, 348 P.2d 143, 146.

¶67 The substantial compliance standard is appropriate, in our view, as a matter of public policy. That standard is designed to provide vindication of a right which benefits the public as much or more than the individual defendant. As one commentator has succinctly put it, "[e]rrors that have a societal effect beyond the effect they have on the particular defendant should tend more toward reversibility." McCord, *The "Trial"/"Structural" Error Dichotomy*, 45 U. Kan. L. Rev. at 1455. Errors infringing upon the right to trial by a fair and impartial jury encroach so fundamentally upon our democratic conception of justice, embodied in the right to a jury trial, that they are errors which should tend towards reversal. For this Court has long recognized "the insistence with which the people of this country maintain the right of trial by jury." *Clark*, 86 Mont. at 512, 284 P. at 267.

¶68 The rationale underlying the substantial compliance standard, then, is that any material deviation from statutory procedures designed to ensure that jury selection results in "trial by a representative group are undermining processes weakening the institution of jury trial, and should be sturdily resisted." *Glasser,* 315 U.S. at 86, 62 S.Ct. at 472, 86 L. Ed. at 707. Encouraging reasonably strict compliance with statutory procedures through the substantial compliance standard ensures that jury duty will be allocated fairly among the Montana citizenry, thus ensuring that the right to a fair and impartial jury will remain

inviolate for all.

¶69 The substantial compliance standard, in sum, safeguards the fundamental, democratic notion of community participation in the determination of guilt or innocence. *Duncan*, 391 U.S. at 156, 88 S.Ct. at 1451, 20 L.Ed.2d at 500. Community participation in the administration of criminal justice is "not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system." *Taylor*, 419 U.S. at 530, 95 S.Ct. at 698, 42 L.Ed.2d at 698.

## VII Conclusion: The Resolution of this Appeal

¶70 As stated previously, the fundamental purpose of the jury selection statutes is to provide "random selection of jurors from the entire panel or array, . . . thus securing a fair and impartial jury." *Tribby*, 217 Mont. at 207, 704 P.2d at 416. Although there is no suggestion that the clerk's methods of randomly drawing the jury panel failed to comply with the law, LaMere has pinpointed precisely where in the statutory process the objective of ensuring "random selection" was circumvented--the summoning stage. Of the 200-juror panel randomly drawn, over one-third (70) of the prospective jurors were excluded from possible jury service by virtue of the manner in which the phone-only notification method skewed the random nature and objectivity of the jury selection procedures established by the Montana Legislature.

¶71 By effectively failing to summon the "entire panel or array" drawn for LaMere's trial, the purpose of juror notification--to ensure that the randomly drawn pool of prospective jurors appear in court on the slated day of trial as a representative body of the community-- has been totally undermined. That a pool of prospective jurors be a representative body of the community is secured, in part, by the requirement of § 3-15-505, MCA (1997), that persons drawn for jury duty receive a jury summons by mail or personal service and respond thereto.

¶72 While we have no reason on the record to question the clerk's intentions in utilizing the telephone to summon prospective jurors, "[p]rocesses which permit human subjectivity to influence the objective, random system often foster biased results. Regardless of the good intentions of the persons in charge of jury selection, their interplay with the system necessarily skews the system . . . ." *Davis*, 867 F.2d at 1013. A failure to summon "one or more of the jurors drawn" by the persons in charge of jury selection--a substantial failure to comply with statutory requirements--could "defeat the constitutional guaranty of an

impartial jury" and, therefore, is subject to a rule of automatic reversal. *See Groom*, 49 Mont. at 359, 141 P. at 859.

¶73 Furthermore, telephone summoning not only frustrates the random nature of the selection process, but also undermines the principle of granting juror excuses only on the basis of objective criteria. As LaMere suggests, a phone-dependent summoning procedure constitutes an impermissible, "largely voluntary jury system"; a prospective juror is allowed to excuse himself or herself from possible jury duty simply by failing to return the clerk's phone call. This we will not countenance.

> Jury service brings the citizen into contact with the law, and makes him [or her] a constituent part of legal administration. It gives him [or her] "the sort of training that is needed in a people who are to live under free institutions." Moreover, <u>it is . . . the duty of the citizen to serve upon the jury when summoned and to carry his [or her] part in the administration of public justice</u> . . . . [Emphasis added.]

*Carroll, 87 Mont. at 51-52, 284 P. at 1010 (citation omitted).*

¶74 Jury service is a duty as well as a privilege of citizenship. Thiel v. Southern Pac. Co. (1946), 328 U.S. 217, 224, 66 S.Ct. 984, 987, 90 L.Ed. 1181, 1187. Jury duty cannot be lightly shirked, as the telephone summoning method allows, without doing violence to the democratic nature of the jury system. "[T]he broad representative character of the jury should be maintained, partly as assurance of a diffused impartiality and partly because sharing in the administration of justice is a phase of civic responsibility." *Thiel*, 328 U.S. at 227, 66 S.Ct. at 989, 90 L.Ed. at 1188 (Frankfurter, J., dissenting).

¶75 We hold that LaMere has demonstrated that the substantial failure to comply with the provisions of § 3-15-505, MCA (1997), materially undermined the purpose of the jury selection statutes to provide for random selection of jurors on the basis of objective criteria. Thus, LaMere is entitled to a new trial.

¶76 The District Court is reversed, LaMere's conviction is vacated, and this case is remanded for trial.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ JAMES C. NELSON

/S/ TERRY N. TRIEWEILER

/S/ WILLIAM E. HUNT, SR.


Justice Karla M. Gray, specially concurring.

¶77 I concur in the result the Court reaches. Indeed, I agree entirely with the first twenty paragraphs of the Court's opinion and, most importantly, with the first sentence in ¶ 21. I disagree strongly with the approach the Court utilizes thereafter in reaching its decision to reverse the District Court in this case.

¶78 As background, it is appropriate to observe that we decided *Robbins* on December 8, 1998, little more than one year ago. There, we applied the "prejudicial error" standard for reversal set forth in § 46-20-701(1), MCA, and affirmed the district court, holding that Robbins failed to demonstrate prejudice affecting his substantial rights. *Robbins*, ¶¶ 52-53.

¶79 In the present case, the Court correctly notes that LaMere requests us to overrule *Robbins* on the sole basis that we failed to follow established precedent holding failure to substantially comply with statutory procedures governing jury selection *per se* reversible without any proof of prejudice. The Court also correctly notes that none of those pre-*Robbins* cases was decided in the context of § 46-20-701, MCA, Montana's harmless error statute. Finally, and importantly, the Court states that "LaMere provides this Court with no convincing rationale as to why a statutory violation in the procurement of a trial jury should not be amenable to harmless error review pursuant to § 46-20-701, MCA." I could not agree more.

¶80 Under that circumstance, it is my view that our duty is to apply § 46-20-701, MCA, and *Robbins* (with one qualification discussed below), and determine thereunder whether the trial court's error here was harmless or whether LaMere established prejudice entitling him to a reversal and remand for a new trial. That approach comports with our general jurisprudential practice of deciding cases on the basis of the issues presented by the parties to the District Court and this Court and, following that approach, I would determine on the record before us that LaMere established sufficient prejudice to require a reversal and new trial.

¶81 Instead of doing so, the Court launches into a lengthy and scholarly discussion of questions of substantial magnitude which have never before been addressed in Montana. I do not necessarily disagree with many of the principles and much of the legal analysis presented. My concern, though, is that I am confident there are arguments to be made-- arguments which may well be persuasive--on the other side of the propositions the Court champions. We have neither heard those arguments nor had an opportunity to hear them. They have not been presented to this Court for scrutiny or analysis. It is my view, oft- stated, that--absent some compelling reason such as a question of whether we have jurisdiction to entertain a case--we should not depart from the issues and arguments presented by the parties. It is unfair to the trial courts and, at some very basic level, it may well impinge on a party's due process right to be heard.

¶82 Given the Court's recognition that LaMere presents no convincing rationale as to why *Robbins* and § 46-20-701, MCA, should not be applied, it is incumbent on us to resolve this case accordingly. Perhaps the analysis presented in the Court's opinion could be presented as a special concurring opinion, sowing the seed for a party to raise it in a future case. Perhaps the entire "structural error" versus "trial error" question should simply be left to a case in which a party argues for it. In sweeping so wide--and so unnecessarily--as the Court does here, we ignore the parties and the trial court.

¶83 Perhaps more importantly, the Court has turned its back on the important doctrine of *stare decisis* without any reason whatsoever. *Stare decisis* means "to stand by things decided." Black's Law Dictionary 1414 (7th ed. 1999). It is of fundamental and central importance to the rule of law (Patterson v. McLean Credit Union (1989), 491 U.S. 164, 172, 109 S.Ct. 2363, 2370, 105 L.Ed.2d 132, 147 (citation omitted)), and there is no question but that "[v]ery weighty considerations underlie the principle that courts should not lightly overrule past decisions." Moragne v. States Marine Lines, Inc. (1970), 398 U.S. 375, 403, 90 S.Ct. 1772, 1789, 26 L.Ed.2d 339, 358. Indeed, we have held that "*stare decisis* is a fundamental doctrine which reflects our concerns for stability, predictability and equal treatment . . . ." Formicove, Inc. v. Burlington Northern, Inc. (1983), 207 Mont. 189, 194, 673 P.2d 469, 472 (citations omitted). In a case such as this, where the appellant has advanced no compelling rationale under which *Robbins* and § 46-20-701, MCA, should not be followed, I submit that the doctrine of *stare decisis* far outweighs any interest the Court may have in examining the "structural error" versus "trial error" questions which it has raised and upon which it resolves the present case.

¶84 Returning to the proper analysis of the present case, it is my view that *Robbins* is

easily distinguishable. There, Robbins' jury selection argument was premised on an *assumption* that persons the clerk was unable to contact by telephone were too poor to afford a telephone and no evidence to support such an assumption was presented. *Robbins*, ¶ 52. We held, as a result, that Robbins failed to demonstrate that the trial court's denial of his motion to strike the jury panel resulted in "actual prejudice" affecting his substantial rights. *Robbins*, ¶ 53. In this latter regard, it is important to recognize that § 46-20-701, MCA, repeats the concept of error "affecting substantial rights" three times; it uses the term "prejudicial error" twice. Nowhere in the statute does the phrase "actual prejudice" appear and, to that extent, I would modify our holding in *Robbins* to strike the word "actual."

¶85 Addressing the issue properly before us in this case, I would conclude that the evidence submitted by LaMere sufficiently established prejudicial error which affected his substantial rights. There can be no doubt that the proper drawing of a jury panel, whether pursuant to statutory procedures or constitutional imperative, is a substantial right. Nor, in my view, is there doubt in this case that LaMere's substantial right was prejudiced by the failure to substantially comply with the statutory procedures. Unlike in *Robbins,* LaMere presented statistics establishing significant disparity in telephone service to residents above and below the poverty line; the evidence also established that the disparity was significantly enhanced when the representative numbers of Anglo Americans and Native Americans in the community were factored in. Moreover, LaMere introduced a statistician's affidavit opining, *inter alia*, that the telephonic summoning procedure used in Cascade County resulted in below-poverty households being seven times more likely to be excluded from jury participation.

¶86 I agree that LaMere's evidence does not establish measurable or quantifiable prejudice. I do not believe, however, that § 46-20-701, MCA, requires evidence meeting such a standard in a jury selection case. I would conclude that LaMere's evidence established sufficient prejudice to his substantial rights and would reverse the District Court on that basis.

/S/ KARLA M. GRAY

Justice Jim Regnier joins in the foregoing specially concurring opinion.

/S/ JIM REGNIER

Chief Justice J. A. Turnage joins in the specially concurring opinion of Justice Gray.

/S/ J. A. TURNAGE

1. LaMere's statistics show the following racial and economic breakdown in access to telephone service in Cascade County:

**ABOVE POVERTY BELOW POVERTY**

|  | With Phone | Without Phone | With Phone | Without Phone |
|---|---|---|---|---|
| **Anglo** | 24,090 | 660 | 3,108 | 719 |
| **American** | | | | |
| **Native American** | 388 | 58 | 255 | 203 |
| **Asian** | 154 | 6 | 21 | 0 |
| **American** | | | | |
| **African American** | 264 | 7 | 60 | 6 |
| **Other Races** | 94 | 10 | 23 | 7 |

2. In 1999 the Montana Legislature repealed § 3-15-505, MCA (1997), and re-enacted it in substantially similar form as § 3-15-405, MCA (1999).

3. Jurors may only be summoned by telephone, under Montana law, when "it appears to a

district judge that <u>additional jurors</u> will be needed for any term or trial," and the judge "order[s] the prospective jurors <u>notified by telephone</u>" by the clerk of court. Section 3-15-506(1), (3), MCA (1997) (emphasis added); *see also* State v. Coleman (1978), 177 Mont. 1, 24-25, 579 P.2d 732, 746 (citing § 93-1512, RCM (1947), the predecessor to § 3-15-506, MCA (1997)).

4. The only substantive difference between § 3-15-505, MCA (1997), and its predecessor is that the <u>clerk</u> is now required to serve notice by mail on prospective jurors, and if a prospective juror fails to respond to that notice by mail, the clerk is then required to have the sheriff personally serve notice on the prospective juror and require a response thereto. *See* § 3-15-505, MCA (1997).

5. Section 46-16-112, MCA, now sets forth the procedure for making a challenge "to the manner in which a jury panel has been selected or drawn . . . ." Section 46-16-112(1), MCA. Where the court determines that the jury panel was improperly selected or drawn, it is required to discharge the panel and order "the selection or drawing of a new panel in the manner provided by law." Section 46-16-112(4), MCA.

6. Nor has the Court ever expressly held, in the absence of purposeful discrimination, that a failure to comply with statutory procedures in jury selection is not subject to the harmless error standard. Intentional discrimination in the selection of petit and grand juries violates the constitutional right of equal protection, and cannot be found to be harmless. *See* Vasquez v. Hillery (1986), 474 U.S. 254, 261-64, 106 S.Ct. 617, 622-24, 88 L.Ed.2d 598, 607-09. A *per se* rule of reversal in that context appears to be premised on the "grave constitutional trespass" resulting from intentional discrimination and the need to vindicate the right of equal protection. However, the fair cross-section requirement is generally said to protect "representational due process values." *See* Hobby v. United States (1984), 468 U. S. 339, 346, 104 S.Ct. 3093, 3097, 82 L.Ed.2d 260, 267; 2 Wayne R. LaFav & Jerold H. Israel, *Criminal Procedure* § 15.3(c), at 294 (1984); *but see* Peters v. Kiff (1972), 407 U. S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (applying a *per se* rule of reversal to a white defendant's challenge to the exclusion of blacks from grand jury service on the basis of the due process right to a competent and impartial tribunal).